Howard H. RAPP, Administrator of the Estate of Richard F. Zeller, Deceased

v.

EASTERN AIR LINES, INC., Lockheed Aircraft Corporation, General Motors Corporation and the United States of America.

Dudley A. WARD

v.

EASTERN AIR LINES, INC., Lockheed Aircraft Corporation, General Motors Corporation and the United States of America.

Nancy A. FRANKENFIELD, Administratrix of the Estate of George B. Frankenfield, Jr., Deceased

v.

EASTERN AIR LINES, INC., Lockheed Aircraft Corporation, General Motors Corporation and the United States of America.

Donald A. SCOTT, Administrator of the Estate of Thomas L. Moody, Deceased

v.

EASTERN AIR LINES, INC., Lockheed Aircraft Corporation, General Motors Corporation and the United States of America.

Civ. A. Nos. 30078, 30079, 30284 and 30346.

United States District Court E. D. Pennsylvania.

Jan. 20, 1967.

As Amended Jan. 25, 1967.

John R. McConnell, Morgan, Lewis & Bockius, Philadelphia, Pa., for plaintiffs.

William T. Conlan, Ely, Bartlett, Brown & Proctor, Boston, Mass., for defendant, Eastern Air Lines, Inc.

Sidney L. Wickenhaver, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for defendant, Lockheed Aircraft Corp.

F. Hastings Griffin, Jr., Dechert, Price & Rhoads, Philadelphia, Pa., for defendant, General Motors Corp.

Philip Silverman, U. S. Dept. of Justice, Civ. Div., Washington, D. C., for defendant, The United States.

## GENERAL FINDINGS OF FACT, SPECIFIC FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW, AND JUDGMENT

WOOD, District Judge.

### GENERAL FINDINGS OF FACT

On October 4, 1960, Eastern Air Lines Flight 375 crashed into the waters of Boston Harbor just outside Logan Airport in Boston, Massachusetts. The plane was on a commercial flight from Boston to Philadelphia. Fifty-nine passengers and the three crewmen were killed; 10 persons survived. The airplane was a Lockheed 188 Electra, a four-engine turbo-prop aircraft. The 501-D-13 engines had been designed and built by General Motors.

The flight took off from runway 9 which is 7,021 feet in length. The taxi out to the runway, the take-off roll, the lift-off and the climb were all normal. The aircraft climbed naturally to about 200 feet, when a burst of flame erupted very briefly and quickly from number one engine. After the burst of flame, the aircraft continued to climb for 200–300 feet, reaching a maximum of 400–500 feet, when the number one engine came to a complete stop and the propeller on number one was seen to rotate slowly. The aircraft then made a flat left turn and returned to its original heading parallel to the runway. Thereafter, the plane made another flat left turn, the nose went up and it began to climb, after which it went into a steep left bank, with the right wing high. The crash followed. A total of 47 seconds had elapsed from the take-off to the time of the disaster.

The plane met a flight of starlings about 9/10ths of a mile from the beginning of the runway. Estimates of the amount of dead starlings found on the runway varied from 50 to 100. Five to ten dead gulls were also found in the same general area. A sufficient amount of bird material had penetrated into the air inlet of the plane as to cause the auto-feathering device to shut off number one engine or so as to cause a flame-out and the crew to shut off number one engine. At any rate, the ingestion of the birds into the air inlet caused the number one engine to shut off.

Prior to the certification of the plane, the C. A. A. was fully aware of the frequency with which planes struck birds and flocks of birds, also of the fact that the Electra could ingest birds. Birds constituted a hazard to planes at Logan Airport. The condition of the surface of the Airport, including the presence of various types of weeds, ponds and dumping areas, was such as to attract birds. Moreover, flocks of birds from New England met at Boston during migrating periods and particularly at that time of the year.

One of the issues in the cases is whether the Government was negligent in issuing a type certificate for the Electra or in not restricting the type certificate.

Before an engine is certified, the manufacturer applies to the F. A. A. (formerly the C. A. A.) and is advised of the applicable regulations and is required to submit extensive data. Tests are then set up and conducted, after

which the engine's capabilities are evaluated. The Lockheed Electra was given a type certificate without any conditions or limitations on August 22, 1958. Prior to the certification, the C. A. A. required the conduct of the so-called chicken tests wherein the carcasses of four-pound chickens were injected into the engines intended for use in the Electra. The chicken tests were ordered by the C. A. A. for the purpose of determining the effects of bird ingestion upon the structural components of the subject engine. The first group of chicken tests established first, that the ingestion of the chicken would at specified speeds internally damage the engine, and secondly, such ingestion would result in ·a power loss, sometimes permanent and sometimes temporary. Nothing was done to prevent the power loss or prevent the ingestion of birds.

The air inlet is an opening in that part of the aircraft enclosing the engines. Its purpose is to allow air to flow to the engines without which they cannot function. The propeller blades pass in front of the air-inlet and to some extent deflect material otherwise ingestible. The air-inlet is approximately 14″ x 14″. About a 14″ x 14″ column of air 300 feet long goes into the engines every second.

As a result of this accident, there are approximately 48 cases pending in this Court, and more than 100 in the District of Massachusetts. Of this number, four have been tried and concluded as to liability and damages, pending possible appeal, in the United States Court for the Eastern District of Pennsylvania. Of the above, Rapp, Moody, and Frankenfield were death cases and Ward was a survivor action. The plaintiffs sued Eastern Air Lines, Lockheed, General Motors and the United States. The United States filed a cross-claim against Eastern Air Lines which has not and will not be disposed of by these findings of fact and conclusions of law. They relate only to the issue joined between the plaintiffs and the United States Government. The action against General Motors was dismissed by the Court after agreement of the parties.

## SPECIFIC FINDINGS OF FACT

1. The Administrator of the Federal Aviation Agency, hereinafter referred to as the F. A. A., is empowered and has the duty to promote safety of flight of civil aircraft in air commerce by prescribing and enforcing minimum standards governing the design, construction and performance of aircraft and aircraft engines, in the interest of safety. In prescribing standards, rules and regulations, and in issuing certificates in the discharge of those duties, the Administrator is required to give full consideration to the duty resting upon air carriers to perform their services "with the highest possible degree of safety in the public interest." (N.T. 4226; Aviation Act, Pub.L. 85–726, § 601, 72 Stat. 775, 49 U.S.C.A. § 1421). Prior to December 30, 1958, his predecessor, the Administrator of Civil Aeronautics, had the same duties and obligations. (Former 49 U.S. C.A. § 551(b)).

2. By virtue of these statutory provisions, it is the duty, inter alia, of the Administrator of the F. A. A., and was formerly the duty of his predecessor, the Administrator of Civil Aeronautics, to establish the safety of the design and manufacture of aircraft intended for use in the carrying of passengers for hire in civilian aviation. (Idem and N.T. 4226).

3. Pursuant to those statutory directions, the C. A. A. issued the following regulations:

"(a) The engine shall not incorporate design features or details which experience has shown to be hazardous or unreliable. *The suitability of all questionable design details shall be established by tests.*

"(b) *The design and construction provisions of this subpart shall be applicable to the engine when it is installed * * * and when fitted with an appropriate propeller * * *"* (Title 14 C.F.R.—Civil Aviation, Subpart C, Turbine Engines, Design and

Construction, § 13.200, Scope. Issued under 49 U.S.C. § 551, June 20, 1956, as appears at 14 C.F.R., Chapter 1, Page 525).

\* ´ \* \* \* \* \*

"Turbine power-plant operating characteristics shall be investigated in flight to determine that no adverse characteristics such as stall, surge or flameout, are present to a hazardous degree *during normal and emergency operation of the airplane* within the range of operating limitations of the airplane and engine." (Title 14 C.F.R.—Aeronautics and Space, Subpart E, Powerplant Installation, Installation, § 4b. 409, Turbine powerplant operating characteristics. Issued April 19, 1958). (All emphasis added).

\* \* \* \* \* \*

"The airplane shall not incorporate design features or details which experience has shown to be hazardous or unreliable. The suitability of all questionable design details or parts shall be established by tests." (Title 14 C.F.R.—Design and Construction, Chapter 1, Subpart D, § 4b. 300, Scope).

4. Prior to the certification of the aircraft involved in this suit, the Lockheed Electra, L–188, the Civil Aeronautics Administration, hereinafter referred to as the C. A. A., the predecessor agency of the F. A. A., had from time to time collected and compiled detailed statistics on the collision of aircraft with birds and had published a report thereof in the document which in these proceedings has been received in evidence as Plaintiffs' Exhibit 225. (N.T. 1249, 1249a).

5. That document, Plaintiffs' Exhibit 225, established among many other things relative to bird strikes in commercial aviation, that during the period of the study prior to 1949, and as a result of analyzing 473 records of collision of birds with aircraft in scheduled commercial operations in the United States (Page 1, paragraph 1):

(a) There was as of 1946 more than one such collision per day, namely, 8 per week. (Page 1).

(b) All birds are struck most frequently during migratory seasons and at low elevations above ground. (Idem).

(c) During September and October, bird strikes are about ten times as frequent as in December and about twice the average annual frequency. (Page 3).

(d) On the basis of the data then at hand, the C. A. A. estimated that by 1950 bird strikes would increase to 12 per week. (Page 5).

(e) "Major bird types involved" in the reported strikes included bufflehead ducks, black ducks, wood ducks, American eider ducks, Pacific eider ducks, herring gulls, great black gulls, buzzards, Goshawks, red shouldered hawks, broad winged hawks, common doves, pigeon doves, mud hens, bald eagles, golden eagles, cackling geese, Canadian geese, greater snow geese, trumpeter swans, whistling swans, great horned owls, barred owls, pheasants, sandpipers, crows, pigeons, larks, robins, sparrows, virios, shore birds and various unidentified birds. (Pages 6, 7 and 8).

(f) Of all recorded collisions, 9% involved engines and propellers. (Page 12).

(g) There were two major bird migration routes known to the Civil Aeronautics Administration as of 1949 which proceeded generally south-westerly through New England and converged at Boston. (Page 17).

(h) Page 17 of that report records at Boston four collisions with gulls and two collisions with birds other than gulls. (Page 17).

(i) A total of 38 collisions, or eight per cent of all recorded bird strikes "involved entire flocks of birds". (Page 20).

6. The Lockheed Electra was given a type certificate in 1958 (N.T. 5192, 5193) (specifically, August 22, 1958)

and at that time Plaintiffs' Exhibit 225, which contains the information set out above in request number 5, was available to the Administrator of the C. A. A. and was assertedly considered by the C. A. A. in evaluating the air inlet of this plane. (N.T. 4282).

7. Prior to the certification of the Lockheed Electra, certain tests (hereinafter referred to as the chicken tests) were conducted under the auspices of the C. A. A. Four-pound chickens were injected into the engines used on the Electra. The tests showed that the injection of such a bird mass would at specified speeds internally damage the engine and would cause a loss of power input sometimes temporary and sometimes permanent. The tests were designed to test the strength of the internal structure of the engine and not to determine the effect on the power output.

8. While the motor components were strengthened so that subsequent ingestions did not damage them, nothing was done about the loss of power effect.

9. The C. A. B. knew that the engines could ingest birds on take-off and that if it did so, the plane was likely to lose power.

10. Notwithstanding the knowledge of the certifying agency of the Government concerning the hazard of bird ingestion to the Lockheed Electra, as aforesaid, a type certificate was issued in 1958 (N.T. 5192, 5193) to the Lockheed Electra without any conditions or limitations concerning operation of the Electra at or near airports where birds were known to constitute a hazard, although pursuant to 49 U.S.C.A. § 1423, formerly 49 U.S. C.A. § 553, the certifying agency had the power and the duty to issue a type certificate with such conditions and limitations as were required in the interests of safety.

11. Prior to the subject crash, the F. A. A. knew, or should have known, that birds and flocks of birds over, on or adjacent to the landing areas at Logan Airport constituted a hazard to planes.

12. Prior to the subject crash, the F. A. A. knew, or should have known, that the condition of the surface of Logan Airport, including the presence of various types of weeds, ponds and dumping areas, was such as to attract birds. (Plaintiffs' Exhibits 202, 203; N.T. 1192 to 1201; 316, 317; 1350 to 1354; 1400 to 1402; 1406 to 1410).

13. Pursuant to the provisions of the Federal Aid for Public Airport Development Act of 1946, May 13, 1946 C. 251, § 11, 60 Stat. 176, the Government, acting through the Administrator of the F. A. A., under date of July 1, 1959, entered into a Grant Agreement with the Massachusetts Port Authority for the rehabilitation of certain runways as Project Number 9–19–017–6007. (Plaintiffs' final exhibit, the certified copy of the said Grant Agreement).

14. Said Airport Development Act, and more particularly § 1110 thereof, provides as follows:

"As a condition precedent to his approval of a project under this chapter, the Administrator shall receive assurances in writing, satisfactory to him, that—

\* \* \* \* \* \*

"(3) the aerial approaches to such airport will be adequately cleared and protected by removing \* \* \* or otherwise mitigating existing airport hazards and by preventing the establishment or creation of future airport hazards; "

15. An Electra can climb, fly or maneuver on three engines and probably on two engines.

16. Propeller has four blades and makes 1,020 revolutions per minute. A propeller blade passes in front of the air inlet duct every ⅟₆₈th of a second and helps prevent ingestion.

17. Shape and location of the inlet and the propeller have a beneficial effect on overcoming various types of interruptions to engine operations.

18. Post accident ingestion tests were conducted where birds were shot into

the engines. No recommendations for changes were made after the accident.

19. Experience showed that screens were susceptible to icing conditions which would block the air passage to the engine and could result in power failure (3497–3498; 3501; 3511; 3570).

## DISCUSSION

Were a jury deciding this case, we are convinced that the foregoing general and specific findings of fact would or should be found by them to be clearly proven. We come now to the legal issues raised by plaintiffs and the Government and what conclusions should be drawn from the aforementioned facts.

The plaintiffs assert that the Government was negligent because first, they issued a certificate of airworthiness for a plane which it knew or should have known would ingest birds on take-off with resulting loss of power at a critical period of the flight. Secondly, in issuing a certificate of airworthiness for a plane which it knew or should have known would ingest birds on take-off with no limitations in the certificate against the use of that plane where birds were likely to be encountered.

Thirdly, that the Government was negligent in failing to require the Massachusetts Port Authority to remove the ponds, weeds and garbage dump which they knew or should have known were attracted to birds. Further in that regard, that they had a duty and the power to require the Authority to correct these conditions under the Air Development Act. Finally, they argue that the Government was negligent in permitting this plane to take off under conditions then existing at the airport without some protection or inspection when they knew or should have known that birds in flight were a hazard and could cause permanent or temporary damage to the plane and its internal structure on take-off or immediately thereafter.

On the other hand, the Government disputes all of the above arguments and relies, generally speaking, on the following defense. They assert that un-der the various acts involved as to certification the administrator was empowered to promote the safety of flight by issuing from time to time minimum standards (49 U.S.C.A. §§ 551 and 421 and particularly § 4(b)). (See Appendix). They argue that certain regulations were promulgated which set minimum standards for the design and use of the aircraft, including the one in question. They further argue that the administrator was bound by these regulations which we may assume were created by him and that in the instant case the "minimum" standards were met and that therefore they were justified in issuing the certificate without limitation. They vigorously argue that this was not negligence and that they had no reason in spite of the information at hand to refuse certification or to anticipate that birds would be ingested into the engine in the manner in which they assuredly did on the occasion of this disaster. For example, they argue that "there is nothing in the evidence that would suggest to the administrator that this accident could have happened." With this we strongly disagree. The Government places strong emphasis on the research and test made prior to the accident, but from our search of the record, we are unable to find any test which was consistent with the admitted facts surrounding the disaster in question. The Government further argues that testimony discloses that shortly after take-off the plane was being controlled and that if there was any negligence on the part of the Government, that it was not the proximate cause of the crash. They say that the Federal Airport Grant Act has no application whatsoever since it applies only to aerial approaches to the airport, citing subsection (3) which refers only to approaches and refers to existing airport hazards. On the other hand, they do admit that subsection (3) states "or otherwise mitigating existing airport hazards and by preventing the establishment or creation of future airport hazards." (See Appendix). It is their contention as we understand it, that the existence of ponds, garbage dumps,

and weeds (phragmites) do not come "within the purview of that Act. With this we do not agree. 49 U.S.C.A. § 1101(a) subparagraph (4) specifically states "airport hazard means any * * * object of natural growth located on or in the vicinity of a public airport, or any use of land * * * otherwise hazardous to such landing or taking off of aircraft."

As to the operation of the airport they contend that they were merely a tenant giving clearances to aircraft to avoid collisions and there could be no doubt that they mean by that collisions between various aircraft.

Finally, they vaguely raise an issue in which they state that the Government has no duty to third parties under the facts and issues of this case, with which we totally disagree.

In their final argument before the Court, counsel states insofar as the Government is concerned there was no hazard and that if there were, there was no reasonable reason to suspect that this event would occur.

They have written and made oral statements as to the evaluation of the standards set forth prior to certification which is not in our opinion sufficient to avoid liability, if it exists.

We of course must place ourselves in the perspective of a jury in deciding this case. Needless to say, we would advise them that, generally speaking and without detail, negligence is the doing of some act which a reasonably prudent person would not do, or the failure so to do; that ordinary care is such as a person would exercise in the management of his own affairs to avoid injury to the persons or property of others. We would also ask them to consider the reasonable foreseeability of an event looking back to the negligent act if it existed, and whether they should have reasonably envisioned the events which unfolded and caused the accident. We would also instruct them that if some superseding cause was so extraordinary as not to be reasonably foreseeable, then that could relieve the actor of liability.

We have no hesitancy in determining that the Government was negligent to some degree in the four issues raised by the plaintiffs. The decision which we must reach is whether these negligent acts were a proximate cause of the accident, and if so, were they superseded by the negligence of Eastern. We do not believe so, but if such were the case, then the Government should be relieved of liability and damages. We conclude that their negligence was a proximate cause, and it was not superseded by the negligence of anyone else and that they are legally and factually liable and that damages should be assessed accordingly.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the case against the Government in admiralty under the Suits in Admiralty Act. 46 U.S.C.A. §§ 741–752. Weinstein v. Eastern Air Lines, Inc., 3 Cir., 316 F.2d 758 (1963).

2. The C. A. B. at the time a type certificate for the Lockheed Electra was issued had the duty to promote safety of flight in air commerce by prescribing and revising from time to time such minimum standards governing the design and performance of aircraft engines as may be required in the interests of safety. In prescribing standards, rules, and regulations and in issuing certificates under Subchapter VI of the Civil Aeronautics Safety Regulations, the Board had to give full consideration to the duty resting upon air carriers to perform their services with the highest possible degree of safety in the public interest. The Board had to exercise and perform its powers and duties in such manner as would tend to reduce or eliminate the possibility of accidents in air transportation. 49 U.S. C.A. § 551.

3. The Government was negligent in that the C. A. B. issued a type certificate for the Lockheed Electra attesting to its airworthiness when it knew that the aircraft was capable of ingesting birds on take-off with a resulting loss of power output and which was a serious hazard to a plane. It further was negli-

gent in failing to provide for further tests in determining the outcome when the Electra would meet a flight of birds and ingest them on take-off.

4. The C. A. B. might have prescribed in the type certificate issued for the Electra such other terms, conditions or limitations as were required in the interest of safety. 49 U.S.C.A. § 553(a).

5. In failing to prescribe in the type certificate issued for the Electra that the plane could not be used where birds were known to congregate when the C. A. B. knew or should have known that the aircraft was capable of ingesting birds on take-off with resulting loss of power output and which was a serious hazard to a plane, the C. A. B. was negligent.

6. The Government which had the duty to clear planes for take-off from Logan Airport was negligent in failing to devise a system whereby planes especially of the Electra type would not be cleared for take-off where birds were a known hazard without checking to discover whether birds were at the time of take-off of sufficient quantity to be a menace.

7. The Government was negligent in failing to require the Massachusetts Port Authority at Logan Airport to remove the attractions to birds on the airport surface by filling in the ponds, closing the dumps, cutting down the phragmites, and prohibiting the dumping of garbage and food particles on the airport surface and in failing to take adequate measures to insure that birds would not act as airport hazards when planes were taking off. We conclude thusly in light of the fact that the same governmental agency was responsible for certification for clearing planes for take-off and for requiring airports which receive federal assistance to mitigate existing airport hazards.

8. The slippage of the seat if it did occur was not a superseding intervening cause of the accident such as to relieve the Government from liability.

9. The negligence of the Government was a proximate cause of the crash and of the resulting deaths and injuries.

10. As a result of the negligence of the Government, George B. Frankenfield, Jr., Thomas L. Moody and Richard F. Zeller were killed and Dudley A. Ward was injured.

11. As a result of the negligence of the Government, we find after consideration of the entire record on the question of damages, Nancy A. Frankenfield, Administratrix of the Estate of George B. Frankenfield, Jr., Deceased, is entitled to recover damages in the sum of $180,000.-00.

12. As a result of the negligence of the Government, we find after consideration of the entire record on the question of damages, Donald A. Scott, Administrator of the Estate of Thomas L. Moody, Deceased, is entitled to recover damages in the sum of $47,500.00.

13. As a result of the negligence of the Government, we find after consideration of the entire record on the question of damages, Howard H. Rapp, Administrator of the Estate of Richard F. Zeller, Deceased, is entitled to recover damages in the sum of $146,500.00.

14. As previously noted, the plaintiff Ward was a survivor. There is no evidence in the record as to the damages which he sustained. However, at this stage of the case, with the consent of the Court the action by Ward against Eastern Air Lines has been settled. We have insufficient evidence to determine damages at this time, and that issue will have to abide future developments in these and other cases.

## ENTRY OF JUDGMENT

Accordingly, judgment is entered in favor of plaintiff, Nancy A. Frankenfield, Administratrix of the Estate of George B. Frankenfield, Jr., Deceased, and against the Government in the sum of $180,000.00.

Judgment is entered in favor of plaintiff, Donald A. Scott, Administrator of the Estate of Thomas L. Moody, Deceas-

ed, and against the Government in the sum of $47,500.00.

Judgment is entered in favor of plaintiff, Howard H. Rapp, Administrator of the Estate of Richard F. Zeller, Deceased, and against the Government in the sum of $146,500.00.

## APPENDIX

§ 551. General safety powers and duties of Board; delegation of authority to Administrator

(a) The Board is empowered, and it shall be its duty to promote safety of flight in air commerce by prescribing and revising from time to time—

(1) Such minimum standards governing the design, materials, workmanship, construction, and performance of aircraft, aircraft engines, and propellers as may be required in the interest of safety;

\* \* \* \* \* \*

(b) In prescribing standards, rules, and regulations, and in issuing certificates under this subchapter, the Board shall give full consideration to the duty resting upon air carriers to perform their services with the highest possible degree of safety in the public interest and to any differences between air transportation and other air commerce; and it shall make classifications of such standards, rules, and regulations, and certificates appropriate to the differences between air transportation and other air commerce. The Board may authorize any aircraft, aircraft engine, propeller, or appliance, for which an aircraft certificate authorizing use thereof in air transportation has been issued, to be used in other air commerce without the issuance of a further certificate. The Board shall exercise and perform its powers and duties under this chapter in such manner as will best tend to reduce or eliminate the possibility of, or recurrence of, accidents in air transportation, but shall not deem itself required to give preference to either air transportation or other air commerce in the administration and enforcement of this subchapter.

(c) The Civil Aeronautics Board, subject to such terms, conditions, and limitations as the Board may specify, is empowered to delegate to the Administrator the power or authority to prescribe rules, regulations, and standards under this subchapter and to perform functions authorized under section 582 of this title. The Board may modify, suspend, revoke, or terminate such power or authority so delegated by it to the Administrator and may prescribe by rules and regulations such provisions and procedures for review of actions taken by the Administrator under authority delegated hereunder as it may deem necessary and appropriate in the public interest. Except as specifically provided in the rules and regulations of the Board, the filing of a petition for review shall not excuse any person from complying with the action of the Administrator nor operate in any manner to stay the enforcement of such action: *Provided,* That nothing in this subsection shall be construed as amending, modifying, or repealing any provision of the Administrative Procedure Act. June 23, 1938, c. 601, Title VI, § 601, 52 Stat. 1007; 1940 Reorg.Plan No. III, § 7, eff. June 30, 1940, 5 F.R. 2109, 54 Stat. 986; 1940 Reorg.Plan No. IV, § 7, eff. June 30, 1940, 5 F.R. 2421, 54 Stat. 1235; July 1, 1948, c. 792, § 4, 62 Stat. 1217.

The statute was amended after the certification and now reads as follows:

§ 1421. Powers and duties of Administrator—Minimum standards; rules and regulations

(a) The Administrator is empowered and it shall be his duty to promote safety of flight of civil aircraft in air commerce by prescribing and revising from time to time:

(1) Such minimum standards governing the design, materials, workmanship, construction, and performance of aircraft, aircraft engines, and propellers as may be required in the interest of safety;

\* \* \* \* \* \*

(b) In prescribing standards, rules, and regulations, and in issuing certificates under this subchapter, the Administrator shall give full consideration to the duty resting upon air carriers to per-

form their services with the highest possible degree of safety in the public interest and to any differences between air transportation and other air commerce; and he shall make classifications of such standards, rules, regulations, and certificates appropriate to the differences between air transportation and other air commerce. The Administrator may authorize any aircraft, aircraft engine, propeller, or appliance, for which an aircraft certificate authorizing use thereof in air transportation has been issued, to be used in other air commerce without the issuance of a further certificate. The Administrator shall exercise and perform his powers and duties under this chapter in such manner as will best tend to reduce or eliminate the possibility of, or recurrence of, accidents in air transportation, but shall not deem himself required to give preference to either air transportation or other air commerce in the administration and enforcement of this subchapter.

### § 553.  Aircraft certificates

(a) (1) The Administrator of Civil Aeronautics is empowered to issue type certificates for aircraft, aircraft engines, and propellers; to specify in regulations the appliances for which the issuance of type certificates is reasonably required in the interest of safety; and to issue such certificates for appliances so specified.

(2) Any interested person may file with the Administrator of Civil Aeronautics an application for a type certificate for an aircraft, aircraft engine, propeller, or appliance specified in regulations under paragraph (1) of this subsection. Upon receipt of an application, the Administrator of Civil Aeronautics shall make an investigation thereof and may hold hearings thereon. The Administrator of Civil Aeronautics shall make, or require the applicant to make, such tests during manufacture and upon completion as the Board deems reasonably necessary in the interest of safety, including flight tests and tests of raw materials or any part or appurtenance of such aircraft, aircraft engine, propeller, or appliance.

If the Administrator of Civil Aeronautics finds that such aircraft, aircraft engine, propeller, or appliance is of proper design, material, specification, construction, and performance for safe operation, and meets the minimum standards, rules, and regulations prescribed by the Board, it shall issue a type certificate therefor. The Board may prescribe in any such certificate the duration thereof and such other terms, conditions, and limitations as are required in the interest of safety. The Administrator of Civil Aeronautics may record upon any certificate issued for aircraft, aircraft engines, or propellers, a numerical determination of all of the essential factors relative to the performance of the aircraft, aircraft engine, or propeller for which the certificate is issued.

The statute was amended after the certification and now reads as follows:

### § 1423.  Aircraft certificates—Authorization to issue; application; investigation; tests; issuance of type certificate

(a) (1) The Administrator is empowered to issue type certificates for aircraft, aircraft engines, and propellers; to specify in regulations the appliances for which the issuance of type certificates is reasonably required in the interest of safety; and to issue such certificates for appliances so specified.

(2) Any interested person may file with the Administrator an application for a type certificate for an aircraft, aircraft engine, propeller, or appliance specified in regulations under paragraph (1) of this subsection. Upon receipt of an application, the Administrator shall make an investigation thereof and may hold hearings thereon. The Administrator shall make, or require the applicant to make, such tests during manufacture and upon completion as the Administrator deems reasonably necessary in the interest of safety, including flight tests and tests of raw materials or any part or appurtenance of such aircraft, aircraft engine, propeller, or appliance. If the Administrator finds that such aircraft, aircraft engine, propeller, or appliance is

of proper design, material, specification, construction, and performance for safe operation, and meets the minimum standards, rules, and regulations prescribed by the Administrator, he shall issue a type certificate therefor. The Administrator may prescribe in any such certificate the duration thereof and such other terms, conditions, and limitations as are required in the interest of safety. The Administrator may record upon any certificate issued for aircraft, aircraft engines, or propellers, a numerical determination of all of the essential factors relative to the performance of the aircraft, aircraft engine, or propeller for which the certificate is issued.

§ 1110. Project sponsorship; requirements; contracts between Administrator and public agencies; relief of sponsors

As a condition precedent to his approval of a project under this chapter, the Administrator shall receive assurances in writing satisfactory to him, that—

\* \* \* \* \* \*

(3) the aerial approaches to such airport will be adequately cleared and protected by removing, lowering, relocating, marking, or lighting or otherwise mitigating existing airport hazards and by preventing the establishment or creation of future airport hazards;

§ 1101. Definitions; airport classifications

(a) As used in this chapter—

\* \* \* \* \* \*

(4) "Airport hazard" means any structure or object of natural growth located on or in the vicinity of a public airport, or any use of land near such airport, which obstructs the air space required for the flight of aircraft in landing or taking off at such airport or is otherwise hazardous to such landing or taking off of aircraft.

§ 742. Libel in personam

In cases where if such vessel were privately owned or operated, or if such cargo were privately owned or possessed, or if a private person or property were involved, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States or against any corporation mentioned in section 741 of this title.