Edward B. BROOKS, Jr., et al., Plaintiffs-Appellees Cross Appellants,

v.

UNITED STATES of America, Defendant-Appellant Cross-Appellee.

No. 81–1530.

United States Court of Appeals, Fifth Circuit.

Jan. 21, 1983.

As Amended on Denial of Rehearing March 17, 1983.

James A. Rolfe, U.S. Atty., Stafford Hutchinson, Asst. U.S. Atty., Dallas, Tex., William R. Herman, Atty., Barbara B. O'Malley, Spec. Lit. Counsel, Torts Branch, Civ. Div., Dept. of Justice, Washington, D.C., for defendant-appellant cross-appellee.

Strasburger & Price, H. Norman Kinzy, Royal H. Brin, Jr., P. Michael Jung, Dallas, Tex., for plaintiffs-appellees cross-appellants.

Before BROWN, GEE and JOLLY, Circuit Judges.

GEE, Circuit Judge:

This tort action arises out of an airplane landing accident in which there was no personal injury. On January 14, 1977, a plane flown by one of the plaintiffs, Brooks, landed at the Calhoun County Airport (CCA) in Port Lavaca, Texas. As the plane reached the second half of the runway it encountered a part of the surface which had been torn up by construction work. As a result, the nose wheel collapsed and the airplane was badly damaged. The present action was brought against the Government under the Federal Tort Claims Act. The district court found that the total damage suffered by plaintiffs was $214,528, and, pursuant to the Texas comparatve negligence statute, apportioned the causal negligence 75% to the Government and 25% to the plaintiffs.

Construction on the far half of the major runway at the Calhoun County airport had begun on January 10, 1977, four days before the accident. On that day, the airport fixed base operator at CCA called the Federal Aviation Administration (FAA) to request that the FAA issue a Notice to Airmen (NO-

TAM) that the runway would be closed until further notice. The NOTAM was properly filed, which indicates that it would have appeared first as a separate teletype message and then in summary form as a part of the hourly weather sequences on the FAA teletype.

On the day before the crash, Brooks, the pilot, telephoned the flight service station at Dallas to obtain weather information for the next day for his destination, CCA. During this conversation, the flight service station specialist reported to Brooks the general weather outlook. He did not give to Brooks the current weather sequences, which would have contained the NOTAM report of the construction at CCA, because he felt Brooks was calling too far ahead of his planned flight time to have meant to rely, without further inquiry, on the information furnished. The call was received at 9:46 p.m. and the flight was scheduled for the afternoon of the following day, by which time the weather information available at the time of the call would no longer be reliable. The flight service station specialist in Dallas therefore believed that Brooks would call again when he could receive weather information which would be current at the time of flight. Brooks therefore did not receive the NOTAM report on the construction at CCA.

Brooks did not call the Dallas flight service station again before beginning his flight to CCA at about 1:00 p.m. on January 14. Brooks claims that he believed he had received a "preflight briefing" during his call the evening before, a briefing that he assumed would have included any pertinent NOTAM information. He admitted that he understood he had not received current weather sequences and that he did not seek updated weather sequences or NOTAM reports during the rest of the flight.

During the flight from Dallas to CCA, Brooks received clearance from Houston Air Traffic Control Center for an instrument approach to CCA. Brooks was not given any information by the air traffic controller about the construction at CCA; yet, air traffic controllers at enroute facili-

ties such as Houston are not responsible for furnishing weather or NOTAM information unless they have actual knowledge of it or pilots request it. The controller who cleared Brooks' plane did not know of the construction at CCA; although NOTAM information is circulated to Houston, it is simply posted and is not a part of the controller's essential information.

After receiving clearance from Houston, Brooks called Palacios Flight Service Station en route to cancel his Instrument Flight Rules plan and to request information about the wind direction, velocity and altimeter setting at Palacios. Although Palacios was informed of the construction at CCA, once again Brooks was not advised. The supervisor of the flight service station specialist who advised Brooks testified that it would have been "good practice" to have furnished Brooks the construction information. The government concedes negligence in this failure.

There is no FAA control tower at Calhoun County Airport. Instead, there is a UNICOM (air-to-ground radio communication facility) which pilots use to announce their arrivals and to talk to airport personnel and other pilots about weather, other aircraft in the area, and active runway information. Despite the fact that it is good operating practice to do so, and that Brooks was unfamiliar with the airport, Brooks did not consult the UNICOM before landing. At the time of the landing, one of the CCA airport employees was operating the UNICOM, and, since the construction had begun four days before, this employee had been advising all aircraft calling the airport about the runway construction. There was another runway at CCA which was not under construction.

It also is good operating practice, indeed standard procedure, for a pilot who is planning to land at an airport (or on any other surface) without a control tower first to fly over the intended landing area in order to detect any unusual conditions. As do all qualified pilots, Brooks knew of this procedure; despite this, and despite the fact that he had never before landed at CCA, he did

not "overfly" the runway before landing. Instead, he approached the runway in a manner which afforded him no close view of it whatever, coming in on a perpendicular course and making a right turn off the active end for a final approach for landing. The construction company working on the runway had placed yellow wooden markers measuring sixty by sixty feet off each end of the runway. The district court found these markings to be deficient under FAA recommendations because they were placed in the shape of a " + " rather than an " × " and because they were placed in the grass in front of the runway rather than across the numbers painted on the runway's end. Brooks, focusing his attention on the first third of the runway, never saw the markings, and discovered the torn-up portion of the runway just before his plane ran onto it after landing.

The acts and omissions upon which the district court based its determinations of negligence and proximate cause were:

(1) Defendant's (the FAA) failure to inform Brooks of the NOTAM advising that the Calhoun runway was closed for construction.

(2) Defendant's (the FAA) failure to mark the closed runways properly.

(3) Plaintiff's (Brooks) failure to obtain all available information concerning his flight before takeoff, to make radio contact with the airport at which he landed before landing, and to overfly the airport before the landing.

Plaintiff and defendant each attack the findings of negligence against themselves. Both admit that the rule by which we review findings of negligence and proximate cause is the clearly erroneous standard of Rule 52(a), the Federal Rules of Civil Procedure. *Black v. United States*, 441 F.2d 741, 743 (5th Cir.1971), *cert. denied*, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186.

In suits under the Federal Tort Claims Act issues of liability are governed by state law. Under Texas law, liability growing out of aircraft accidents is determined by ordinary rules of negligence and due care. *United States v. Schultetus*, 277 F.2d 322 (5th Cir.1960), *cert. denied*, 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56. The essential elements of actionable negligence are the existence of a duty, breach of it, and resulting injury. *Cody v. Mahone*, 497 S.W.2d 382 (Tex.Civ.App.1973). In Texas, foreseeability as an element of proximate cause does not include consequences that arise from unusual occurrences, nor is a person bound to anticipate the negligent conduct of another. *De Winnie v. Allen*, 154 Tex. 316, 277 S.W.2d 95 (1955). Bearing these general principles in mind, we turn to the rulings of the court below.

### A. Findings Against the United States.

The district court found the United States negligent because of the failure of the FAA employees at Dallas, Houston and Palacios to advise Mr. Brooks of the condition of the runways as stated in the NOTAM. It also concluded that "FAA employees had a duty to properly mark the closed runway ..." and that since "[t]he runway was not properly marked ... this breach of duty constituted negligence, which was a proximate cause of the accident in question." We take up the latter finding before discussing the actions of the several flight controllers.

That the plowed-up runway was improperly marked is not disputed. Four days before the accident, the contractor hired by the county to redo the strip put out crosses off the ends of the runway rather than the " × 's" across its numerals that FAA circulars require. Assuming, without deciding, that the United States had some duty to see that the marking was done correctly, we find the record bare of evidence that this duty was negligently breached.

The findings of the district court on the point are quoted in full above. They do not advise us of the source of the duty that they assert in the United States nor in what manner it was negligent. Read literally, they state that the FAA was *itself* bound to mark the runway and that, since it did not, it was negligent. Plaintiff disavows this construction, however, conceding that the

FAA had no duty to mark, but only one to ensure that the marking was done and done right. The concession is a prudent one. CCA is not an FAA-operated facility, nor are any FAA employees stationed there. We find no basis for imposing a duty to mark on the FAA.

Plaintiff attempts, however, to construct a basis for the asserted duty to ensure proper marking on the part of FAA out of such materials as it finds at the site. These are extensive supervisory powers granted the FAA in the Airport and Airway Development Act of 1970 (AADA), the issuance of a merely advisory circular by FAA specifying the proper modes of marking inactive runways, the partial financing of the runway reconstruction project with FAA funds, and the common-law doctrine of negligent entrustment. On examination, however, the structure will not sustain the weight of the court's finding of negligence.

The portion of the AADA relied on by plaintiffs provides that the Secretary [of Transportation], before approving such an airport development project as this, "shall receive assurances in writing, satisfactory to him, that—

. . . .

(3) the aerial approaches to the airport will be adequately cleared and protected by removing, lowering, relocating, marking, or lighting or otherwise mitigating existing airport hazards and by preventing the establishment or creation of future airport hazards; . . ."

49 United States Code § 1718.

There is no indication, however, that such assurances were not received in this case, and plaintiffs do not so contend. Instead, they suggest that the quoted language creates a duty on the part of the FAA to see that the advisory circular specifying the proper mode of marking closed runways was complied with, citing as their sole authority for this proposition the district court opinion in *Rapp v. Eastern Air Lines, Inc.,* 264 F.Supp. 673 (E.D.Pa.1967), *vacated by agreement,* 521 F.2d 1399 (3d Cir.1970).

Plaintiffs do not contend that the vacated opinion is binding precedent anywhere but

that, as "the most pertinent statement of the governing law, even if . . . not directly binding," it merits court consideration. *See County of Los Angeles v. Davis,* 440 U.S. 625, 646, 99 S.Ct. 1379, 1390, 59 L.Ed.2d 642 (1979) (Powell, J., dissenting). We find little in the reasoning of that opinion to support deriving such a duty from the quoted passage of the AADA, however, and even assuming that it would do so, a clear factual distinction as to negligence.

The airport in *Rapp* was one where all aircraft were handled directly by FAA controllers who cleared them for takeoff, landing, and so on. The crash was caused by birds ingested in engine air intakes, and the court found specifically that the FAA knew, or should have known, that the condition of the airfield—dotted with ponds, weeds and dumping areas—was such as to attract birds. So finding, the court concluded, among other determinations of negligence:

> The Government was negligent in failing to require the Massachusetts Port Authority at Logan Airport to remove the attractions to birds on the airport surface by filling in the ponds, closing the dumps, cutting down the phragmites [weeds], and prohibiting the dumping of garbage and food particles on the airport surface and in failing to take adequate measures to insure that birds would not act as airport hazards when planes were taking off. We conclude thusly in light of the fact that the same governmental agency was responsible for clearing planes for takeoff and for requiring airports which receive federal assistance to mitigate existing airport hazards.

284 F.Supp., at 681.

Such is a far cry from our case, one in which the improper markings had existed for no more than four days prior to the accident and there is no evidence whatever that any FAA employee knew or should have known of them. The court below made no such finding and we see little or nothing upon which to base one, even were we to agree with the apparent assertion of the *Rapp* court that the language of Section 1718 creates such a duty.

Plaintiffs do not rest upon *Rapp* in its direct manifestation alone, however. In addition, they suggest another interpretation of it: "[t]he *Rapp* case is merely a recognition that the common-law doctrine of negligent entrustment applies to the provision of federal funds to an airport operator for construction purposes," citing *Russell Construction Co. v. Ponder,* 143 Tex. 412, 186 S.W.2d 233 (1945) for the recognition of that doctrine in Texas laws. We must reject this ingenious argument as well.

Consulting the authority cited, we find this statement of Texas law:

> ... this case comes within the rule, well established in this jurisdiction, that, if the owner of an automobile, knowing that its brakes are in bad working order, permits another to drive it upon the public highways, he becomes liable for injuries proximately caused by the inadequacy of the brakes. The same principle is applicable if the owner entrusts it to another for use upon the highways knowing that the one to whom it is entrusted is an incompetent and reckless driver. In each instance the owner's liability is based upon his own negligence in entrusting a dangerous instrumentality to another or in entrusting the automobile even though it be in good repair, to a known incompetent, thereby creating an instrument of danger.

186 S.W.2d, at 235.

In order to accept plaintiffs' proposed analogy, it would be necessary for us to equate the federal funds advanced here by FAA with an automobile having bad brakes[1] or the Calhoun County authorities with an incompetent and reckless driver. To state such a proposition is to answer it; among the many reasons for rejecting it is that there was neither finding nor evidence that there was anything defective about the funds advanced (if such a thing can be imagined) or that the Calhoun County authorities were in any degree reckless or incompetent, prone to hire contractors who mark closed runways improperly. In sum, even if we assume that the FAA had a duty in the premises, derived from some unspeci-

fied and arcane source, there is no support in this record for the court's finding that it was *negligently* breached. It is reversed.

■ The court's other findings of negligence by the United States all concern the three failures by FAA controllers to tell Mr. Brooks, the pilot, of the NOTAM advices concerning the runway. The government concedes that the failure of the Palacios controller to do so was negligent, hence we need not discuss that matter. At issue, however, are the findings of negligence for the failures of the Dallas and Houston employees to do so. Although, for reasons that we will indicate briefly, we regard each of these findings as a very close one indeed and the degree of negligence indicated by the evidence slight, at most, our deference for the trial judge's determinations—based on his opportunity to hear and observe the manner of the witnesses' testimony—persuades us that although ours might have been different we should leave his undisturbed.

Mr. Brooks' discussion with the Dallas flight station service specialist was conducted too far in advance of his planned flight for reliable weather information concerning it to be available, hence the briefer did not consult the weather sequence where he would have found the NOTAM. There was much testimony to the all but universal custom of pilots, especially those proceeding under Instrument Flight Rules as was Mr. Brooks, to call for weather briefings and updates a few hours before flight time; and Brooks himself testified that this was both good practice and his usual procedure. We discern little want of care on the briefer's part in assuming that Brooks was simply requesting general weather conditions in his early call and would call again for current conditions before departing, or in his failure to consult weather sequences that would be stale by the time of Brooks' takeoff. Even so, the NOTAM was available, there was testimony that giving it would have been the better practice, had the specialist known of it, and the specialist doubtless had

---

[1] To be sure, federal funds are dangerous, but so are automobiles with *good* brakes.

a general duty to keep up with airport conditions within a reasonable range of his station.

Many of the same considerations apply to the failure of the Houston enroute controller to advise Brooks of the NOTAM, though his duty seems even more attentuated in view of evidence that enroute controllers' duties are primarily to monitor and direct the movements of aircraft in flight, rather than with landings and take-offs, since they cannot see runways and therefore cannot give clearances for these manuevers. In sum, therefore, we view the evidence supporting these findings as closely balanced, perhaps as even preponderating slightly against them, and the permissible degree of negligence inferrable from it as slight, we cannot say that viewing the record as a whole we are left with the definite and firm conviction that a mistake has been committed in either. *Smith v. Hightower,* 693 F.2d 359, 369 (1982). We therefore defer to the trial court as to them.

### B. Findings Against the Pilot.

 The court below found Mr. Brooks, the pilot, to have been negligent in three respects, all of which findings he attacks as clearly erroneous: in failing to obtain sufficient weather and other information regarding the flight; in failing to call in to the CCA UNICOM on his arrival in the area; and in failing to overfly the unfamiliar field before landing.

Regulations having the force of law make it a pilot's duty, before commencing a flight, to familiarize himself with all available information concerning it, including—in the case of one under Instrument Flight Rules, as here—weather conditions, alternate airfields and airport conditions. 14 C.F.R. § 91.5. Brooks did none of these things, omitting the customary preflight call which would have produced the NOTAM and failing to call in flight. As an experienced pilot, he must have known that these notices appeared on the weather sequences. Nevertheless, he elected to rely on stale, general weather data and on his hunches about what the weather would do.

Next he failed to check in with the UNICOM at the uncontrolled airfield, another source from which he would undoubtedly have learned of the runway conditions. For obvious reasons, such check-ins are customary and good practice. Plaintiffs attempt, by breaking Brooks' descent and approach into segments, to argue that he did not have time to make such a call. As he admitted, however, there was nothing that obliged Mr. Brooks to land hurriedly, and he "could have flown around for two or three hours."

Lastly, Brooks failed to overfly CCA, an airport at which he had never before landed and with which he had had no communication, before landing, again breaching good operational practice. Alone of his careless acts, it is possible that this one did not contribute to his crash since the destruction of the runway might not have been apparent to the eye. The district court apparently concluded otherwise, however, since it found the omission a proximate cause of the accident.

Evidence supports all of the above findings, and none is erroneous, clearly or otherwise. Had Mr. Brooks exercised due care in any of them, the accident would almost surely have been averted. He was the airplane commander, charged with direct responsibility for and final authority over the safety of himself, his passengers and the aircraft. 14 C.F.R. 91.3. Their lives, not those of the flight controllers, were at stake during the flight, so that the ultimate risk lay in the same quarter as the final responsibility. Yet not once before or during his IFR flight did he make any effort to obtain current weather or to inquire into field conditions. These serious departures from elementary good practice are all but admitted by him. As to them, we affirm the court's findings.

### C. Reapportioning of the Parties' Comparative Negligence; Award of Interest.

The United States urges us, in the event that we reverse any of the district court's findings of negligence, to ourselves reapportion the comparative negligence of the parties. Assuming that we possess that

power, we yet conclude that the task is better done in the first instance by the court below. We are likewise of the opinion that since the judgment below is reversed in part and since a reapportionment of comparative fault may result in judgment for the United States, the parties' arguments about the correct rate of interest on any judgment and the date from which such interest should run, are best directed to that court.

The judgment is AFFIRMED in part, REVERSED in part and the cause is REMANDED.