Sallie SHANKLE, etc.,
Plaintiff-Appellee,
Cross-Appellant,

v.

U.S.A., Defendant-Appellant and
Cross-Defendant-Appellee,
Cross-Appellee,

v.

Shirley Ann GREIG, etc., et al., Defendant-Cross Plaintiff-Appellant.

No. 85–2008.

United States Court of Appeals,
Fifth Circuit.

Aug. 8, 1986.

Rehearing Denied Sept. 9, 1986.

Robert J. Gross, Jan K. Von Flatern, Washington, D.C., for U.S.

Branton, Warncke, Hall & Gonzales, James L. Branton, Mark J. Cannan, San Antonio, Tex., for Greig.

Fulbright & Jaworski, Winstol D. Carter, Jr., D. Dudley Oldham, Houston, Tex., for Aerialitis, Inc.

Christopher G. Gallavan, Dallas, Tex., for Estate of William Greig.

Clyde Fred Shannon, Barbara N. Nellermoe, San Antonio, Tex., for Sallie Shankle.

Before WISDOM, RUBIN, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This suit was brought under the Federal Tort Claims Act by the widow of a man who was killed when the civilian aircraft in which he was a passenger crashed at a United States Air Force base in Texas. The district court held that the government negligently allowed this plane, along with another civilian craft, to make a poorly planned formation flight over the air base. Holding that Texas tort law will not support a finding of negligence against the government, we reverse.

**I**

The airplanes involved in this accident were a single-winged Citabria and a restored wood-and-fabric Stearman biplane. The Stearman was a model that had been used as a trainer by the Army Air Corps at Randolph Air Base during the 1930's and 1940's. The civilian pilots, William Greig and Thomas Van Etten, had planned for some time to fly over Randolph and photograph the biplane with the "Taj Mahal," an Air Force building historically associated with the Stearman, in the background. On the day of the doomed flight, Air Force Colonel William Bookout happened to see the two planes at a civilian airport near Randolph, and Van Etten had taken the officer for a pleasure flight in the Stearman. When Colonel Bookout, who commanded a squadron of T-37 military jets at the air base, heard about the civilians' plans for a photographic "fly by," he became concerned because he knew that his T-37's were practicing at Randolph.

Randolph has north-south ramps on the east and west sides of the field, which are connected at their south ends by a third ramp. Outside of and parallel to the north-south ramps are two runways. The east runway was closed on the day of the accident, but the west runway was being used by T-37's, which were coming in from the north for touch-and-go landings. The civilians' plan, which they discussed with Colonel Bookout, called for the two planes to fly down the east ramp, then west over the south ramp, and north up the west ramp. The civilians were told not to cross the active west runway, and to get clearance from Randolph's tower before approaching the field. They agreed.

The civilians planned to keep a wingtip-to-wingtip separation of more than three feet, but less than about 200 feet; their vertical separation was to be less than 100 feet. The fly-by was to take place at an altitude between 500 and 1000 feet. The Citabria had a radio, but the Stearman, which was designated as the lead plane, did not; the pilots intended to communicate with each other through hand signals.

Colonel Bookout called Randolph's director of military flight operations, Colonel Reeder, who said that the civilians' flight would have to be approved by the air traffic controller in charge. Reeder called a Captain Rummer, who in turn called Sgt. David Warner, the chief air traffic controller on duty. Sgt. Warner said that he could handle the civilian flight but that he wanted the civilians to contact the tower by radio once they were airborne. The civilians' flight plan was accurately communicated to Sgt. Warner and then to the controller who was assigned to handle the flight.

It was just before sunset when the planes took off from the civilian air field. Greig was piloting the Citabria from its rear seat; Clifford Perry Shankle, Jr., who was going to photograph the Stearman and the Taj Mahal, was in the front seat. Van Etten was flying his Stearman from its

front seat and was carrying Shankle's daughter Michelle as a passenger in the rear seat.

After contacting the Randolph tower by radio, the two planes approached the field from the northeast, flew over the south ramp, and crossed the active west runway before turning north. Shortly thereafter, they collided and crashed, killing both pilots and Shankle, the plaintiff's decedent. Michelle Shankle apparently escaped without serious injury. The cause of the collision was disputed at trial. Several military aircraft were operating in the area, including a T–37 that was approaching the west runway from the north when it took evasive action to avoid the straying civilian planes; it was suggested that this maneuver may have distracted the civilian pilots. The trial judge, however, found that the evasive action, which was ordered from the control tower, was a prudent emergency response to the civilian planes' having improperly crossed the active runway. The court concluded that the immediate fault lay entirely with the civilian pilots. The judge found that both planes had blind spots; that the pilots lost sight of each other by putting each plane in the other's blindspot; and that Greig, who had no experience with formation flying, allowed the Citabria to drift into the Stearman from below. The district judge specifically concluded that none of the military pilots or air traffic controllers was guilty of any negligence.

The district court did find, however, that the government was negligent in "approving" the flight. The court reasoned that the civilians' plan was very poor, especially in light of Greig's lack of experience with formation flying, and that Colonel Bookout should have investigated the plan and the pilots' qualifications more thoroughly before using his influence to help arrange the flight. The court apparently believed that Colonel Bookout could have stopped the flight, but that he took a casual attitude in

the interest of maintaining good relations between the Air Force and the public.

The plaintiff in this case, Shankle's widow, sued the estates of the two dead pilots and the owner of the Stearman, as well as the United States. Because she settled her claims against the estates and the Stearman's owner, the government was the only remaining defendant at trial.[1] The district court, applying Texas rules of comparative negligence, found that neither of the two passengers was negligent; that Greig and Van Etten were both at fault, 40% and 35% respectively; and that the government was 25% at fault. The court ordered that the plaintiff recover $686,803.77 in damages from the United States.

Numerous questions were raised in the appeals brought to this court by the estates of the three decedents. We confine our discussion to the two dispositive issues: (1) whether the district court committed reversible error in concluding that none of the Air Force pilots or air traffic controllers was negligent; and (2) whether the government can be held liable to any of the claimants for allowing a poorly planned formation flight by civilian pilots to take place over a military air base.

## II

### A

The district court's conclusion that none of the air traffic controllers or military pilots was negligent is amply supported by evidence in the record. We affirm this conclusion.

### B

■ When an accident involving a civilian occurs on a federal military reservation, the existence *vel non* of government negligence is determined by the substantive law of the state in which the reservation is located. 28 U.S.C. §§ 1346(b), 2674; *Orr v.*

---

1. Cross-claims by the pilots' estates against the government were dismissed for failure to file administrative claims pursuant to 28 U.S.C. § 2675. Because we conclude that the govern-

ment cannot be held liable in this case, we need not reach the question whether these dismissals were appropriate.

United States, 486 F.2d 270, 274–75 (5th Cir.1973). This includes questions of "[w]hat constitutes a legal duty and when such a duty has been breached...." *Orr,* 486 F.2d at 274. Under Texas law, the ordinary rules of negligence and due care apply to aircraft accidents. *Brooks v. United States,* 695 F.2d 984, 987 (5th Cir. 1983). More specifically: "In order to establish tort liability, a plaintiff must initially prove the existence and breach of a duty owed to him by the defendant. As a general rule, one person is under no duty to control the conduct of another, even if he has the practical ability to exercise such control." *Otis Engineering Corp. v. Clark,* 668 S.W.2d 307, 309 (Tex.1983) (citations omitted).

Because the district court specifically held that the air traffic controllers were not negligent, any government liability would have to be based on the conduct of Colonels Bookout or Reeder or Captain Rummer. The district court appears to have put the blame primarily on Colonel Bookout, who interceded for the civilians at Randolph without first thoroughly investigating the pilots' plans and qualifications for the flight. This analysis assumes that Colonel Bookout had a duty, running to the planes' passengers, either to stop, or at least refrain from facilitating, a hazardous flight.

Although the district judge did not say where he found the source of this duty, the plaintiff points to 14 C.F.R. § 91.85(b) and to ¶ 912b of the government's Air Traffic Control Manual. Section 91.85(b), however, is irrelevant on its face. That regulation forbids unusual maneuvers in airport traffic areas *unless* authorized or required by air traffic control. Because the formation flight was authorized by the appropriate air traffic controller, it does not fall within this proscription. Air Traffic Control Manual ¶ 912b is also irrelevant because its instructions are directed to air traffic controllers, none of whom were found negli-

gent in this case, rather than to such people as Bookout, Reeder, or Rummer.[2] And even if ¶ 912b were relevant, it does not appear to have been violated: the manual discourages unusual maneuvers within airport traffic areas that "are not essential to the performance of the flight"; a formation flight obviously *was* essential to the photographic mission in this case.

■ More to the point are 14 C.F.R. § 91.3(a) ("The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft."); 14 C.F.R. § 91.5 ("Each pilot in command shall, before beginning a flight, familiarize himself with all available information concerning that flight."); and 14 C.F.R. § 91.65(b) ("No person may operate an aircraft in formation flight except by arrangement with the pilot in command of each aircraft in the formation."). These regulations squarely place the responsibility for careful flying on the pilots who do the flying. While air traffic controllers also have some responsibilities for maintaining air safety, we are aware of no regulation that makes anyone but the pilots involved responsible for planning and executing formation flights in a prudent manner.

The plaintiff is driven, finally, to a "reliance" theory based on *Indian Towing Co. v. United States,* 350 U.S. 61, 69, 76 S.Ct. 122, 126–27, 100 L.Ed.2d 48 (1955) (government undertaking to provide lighthouse service imposes a duty to use due care in keeping the light in working order), and *Hartz v. United States,* 387 F.2d 870 (5th Cir.1968) (after undertaking to provide air traffic control service, government may be liable for controller's failure to provide appropriate warnings when clearing a plane for takeoff). The plaintiff argues that Colonel Bookout somehow undertook to assure the decedent's safety by discussing the flight plan with the pilots or by calling the air base in an effort to help the civilians get the necessary permission for the fly-by.

**2.** The fact that Bookout, Reeder, and Rummer outranked the air traffic controllers does not change the analysis. The officers did not order

Sgt. Warner to give permission for the fly-by, and they certainly did not order him to violate any safety regulations.

The citations are inapposite and the logic of the argument is unsatisfactory. Colonel Bookout's warning about the danger posed by the T–37's at Randolph did not impose on him a legal duty to discover additional dangers arising from the pilots' incompetence or inadequate preparations. A rule having this result cannot be drawn from the cited cases. Furthermore it would discourage people from volunteering useful information to persons contemplating hazardous activities and would serve no countervailing legitimate purpose. Similarly, the fact that Bookout or the other officers may have facilitated the granting of permission for the fly-by could not impose on them any greater duty to investigate the pilots' qualifications than would be imposed on the air traffic controller who had the ultimate authority to grant or withhold the necessary permission. Sgt. Warner, however, made no effort to investigate the pilots' qualifications, and the district court specifically held that he was not negligent; if he had no duty to make such an investigation, neither did any of the officers.[3]

■■ With the wisdom of hindsight, it is easy to see that the attempt to photograph the Stearman and the Taj Mahal could have and should have been planned in a much more careful manner. Faced with the effects of the accident on an innocent decedent's family, it is also easy to see that the deep pockets of the federal government can be reached if some of the blame for the accident is pinned on the Air Force officers who *could* undoubtedly have refused permission for the flight. The applicable substantive law, however, does not permit this result.[4] The Supreme Court of Texas has clearly stated that outside certain narrow exceptions, "one person is under no duty to control the conduct of another, even if he has the practical ability to exercise such control." *Otis Engineering, supra,* 668 S.W.2d at 309. The furthest that the Texas Supreme Court has gone in expanding these exceptions is this: "when, because of an employee's *incapacity,* an *employer* exercises *control* over the employee, the employer has a duty to take such action as a reasonably prudent employer under the same or similar circumstances would take to prevent the employee from causing an unreasonable risk of harm to others." *Id.* at 311 (emphasis added). Colonel Bookout was a mere acquaintance of Greig and Van

---

3. We do not doubt that Sgt. Warner would have deferred to his superior officers had they expressed a wish to *forbid* the civilians' flight; indeed, we are willing to assume that he would have been obliged to defer to such a wish. At a military air base, there may be many reasons besides traffic safety for forbidding a civilian overflight or fly-by, and we can assume that Sgt. Warner's superiors had the responsibility for making such decisions. Such responsibilities, however, do not make the government liable in tort for failing to maintain higher standards of air traffic safety than are required at civilian airports. The record contains no indication that an air traffic controller at a civilian airport would have had a legal duty to investigate the pilots' qualifications before allowing a fly-by similar to the one that took place in this case.

4. We note in passing that to hold the government liable in this case would give the military increased incentives to find excuses for denying civilian aircraft access to federal reservations. This would unnecessarily abridge the freedom of the flying public, contrary to public policies favoring the promotion of general aviation. *See, e.g.,* 36 U.S.C. § 202 (one of the purposes of the Civil Air Patrol is "to encourage and foster

civilian aviation in local communities"); *United States Department of Transportation v. Paralyzed Veterans of America,* —— U.S. ——, —— & n. 12, 106 S.Ct. 2705, 2713–14 & n. 12, 91 L.Ed.2d 494 (1986) (among Congress's purposes in providing for the improvement of civilian airports has been to satisfy the growing needs of private recreational pilots); *Northwest Airlines, Inc. v. Goldschmidt,* 645 F.2d 1309, 1316 (8th Cir.1981) (discussing Congress's intent to give the FAA the responsibility for "the advancement and promotion of civil aeronautics generally"). *Cf., e.g.,* 49 U.S.C. § 1304 ("There is recognized and declared to exist in behalf of any citizen of the United States a public right of freedom of transit through the navigable airspace of the United States."); *Massachusetts v. United States,* 435 U.S. 444, 446–47, 98 S.Ct. 1153, 1156–57, 55 L.Ed.2d 403 (1978) (observing that the federal government has expended a great deal of money on a variety of programs to benefit all aircraft flying in the nation's navigable airspace); H.R. Rep. No. 2360, 85th Cong., 2d Sess., *reprinted in* 1958 U.S.Code Cong. & Ad.News 3741, 3749 (expressing concern over the fact that "[t]he location and runway layout of [a military] airport may seriously affect the use of the navigable airspace over a wide area").

Etten, not their employer; neither of the pilots was incapacitated; and neither of them was under Bookout's "control" in any but the most indirect and attenuated sense. *Cf. Pinkham v. Apple Computer, Inc.,* 699 S.W.2d 387, 390 (Tex.Ct.App.1985) (construing *Otis Engineering*'s "control" test narrowly). Under the facts of the present case, neither Bookout nor any of the other Air Force officers had a legal duty to protect the plaintiff's decedent from the risk he took in flying with Greig and Van Etten.[5]

REVERSED AND REMANDED for entry of judgment in favor of the United States.

---

**5.** *A fortiori* the Air Force officers were under no duty to protect Grieg and Van Etten from their own or each other's mistakes.