899 F.2d 438
 Jack H. HAYES and Jennifer Hayes, Plaintiffs-Appellees,
Cross-Appellants,
v.
UNITED STATES of America, Defendant-Appellant, Cross-Appellee.
JET EAST, INC., Plaintiff-Appellee, Cross-Appellant,
v.
UNITED STATES of America, Defendant-Appellant, Cross-Appellee.
 No. 89-1152.
 United States Court of Appeals,
Fifth Circuit.
 May 1, 1990.
 
 Robert J. Gross, Aviation Unit Civ. Div. Torts Branch, U.S. Dept. of Justice, Washington, D.C., for U.S.
 Noley R. Bice, Jr., Fulbright, Winniford, Waco, Tex., Grant Kaiser, Rockne W. Onstad, Abraham, Watkins, Nichols, Ballard, Onstad & Friend, Houston, Tex., for Hayes.
 Charles H. Smith, John W. Moore, Maloney & Smith, Dallas, Tex., for Jet East, Inc.
 Appeals from the United States District Court for the Western District of Texas.
 Before BROWN, WILLIAMS and JONES, Circuit Judges.
 JERRE S. WILLIAMS, Circuit Judge:
 
 
 1
 Appellees Jack Hayes and his wife Jennifer Hayes, and appellee/cross-appellant Jet East, Inc., sued the United States pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. Secs. 2671 et seq., for personal injuries and property damage sustained in an aircraft accident. The district court found the United States 55% negligent and Jack Hayes 45% negligent. Under the Texas comparative negligence statute, Article 2212a, Tex.Rev.Civ.Stat. Sec. 1, Hayes was awarded 55% of his total damages for personal injuries. His wife Jennifer Hayes was awarded damages. Jet East, the owner of the aircraft, received an award of 55% of its property loss.
 
 
 2
 The United States appeals from the judgment, claiming that the district court erred in finding that the United States owed plaintiff/appellees a duty, and also erred in apportioning relative fault. Cross-appellant Jet East appeals, asserting that the district court erred in finding Hayes negligent. We affirm.
 
 I. Facts
 
 3
 On December 20, 1984, a Gates Learjet Model 35 crashed at Madison Cooper Airport, Waco, Texas, during an Federal Aviation Administration (FAA) Learjet Model 35 type rating flight examination. Aboard the plane were Nancy Yates, the pilot applicant; Jack Hayes, the safety pilot; and Marcus Belcher, the FAA aviation safety inspector conducting the test. Hayes was an experienced Learjet pilot and check airman, employed by Jet East, Inc., the owner of the Learjet aircraft. Yates was also a pilot-employee of Jet East, Inc. Both Yates and Hayes held Airline Transport Pilot Certificates for multi-engine aircraft. Belcher was both an examiner for the Federal Aviation Administration and a personal friend of Nancy Yates.
 
 
 4
 On December 21, 1984, Yates was planning to leave her employ with Jet East and move to California with her husband. She was not certified as a Learjet command pilot, and wanted to obtain her type rating certification before leaving Texas. A few days before the moving date, Yates visited her friend Belcher at his home and asked if he would give her the required examination. Belcher was on vacation, but nonetheless he contacted his supervisor and obtained permission to return to work and administer the examination.
 
 
 5
 During a typical Learjet type rating flight test, the applicant sits in the left front seat and the FAA inspector or designated examiner occupies the right front seat as co-pilot. In this instance, however, FAA inspector Belcher was himself lacking sufficient recent experience in the Learjet Model 35 to act as co-pilot or safety pilot. Additionally, it was Jet East's policy to have one of its airmen aboard and sitting in the right seat whenever one of its jets was used in a flight test. As safety pilot and as Jet East's airman, Hayes, therefore, sat in the right front seat. Yates sat in the left front seat, and Belcher sat in the "potty" seat immediately behind the cockpit in the passenger compartment. In that seat, Belcher could see applicant Yates. But he could not see Hayes without leaning forward.
 
 
 6
 In order to pass the test, applicant Yates was required to demonstrate competence at certain maneuvers, one of which was a "V1 cut".[1] A "V1 cut" in a twin-engine Learjet requires the applicant to demonstrate a takeoff with a simulated one-engine failure at a speed in excess of "V1" that in the judgment of the examiner is appropriate to the airplane type under the prevailing conditions. V1 is the velocity at which, once exceeded, the plane must take off. Below that speed, the takeoff can be aborted.
 
 
 7
 An FAA inspector is required to conduct a pre-flight briefing in order to coordinate procedures and responsibilities among the crew members to insure that each participant knows his or her respective role during the flight test.[2] Inspector Belcher did not hold such a briefing because, as he testified, he did not believe it necessary under the circumstances. Both Hayes and Yates had participated in previous similar checkrides. He did, however, speak briefly and informally with Hayes as to the conducting of the test.
 
 
 8
 On the day of the test, the three participants flew the Learjet from Dallas to Waco because of better weather conditions there. During the flight south to Waco, Yates successfully performed various required maneuvers. In Waco, at Belcher's direction, Yates attempted to perform a "V1 cut". When V1 was achieved, Hayes reduced power on the right engine to idle speed. The airplane then "yawed" (slowly turned) to the left, although yawing to the right was to be expected. The airplane continued out of alignment off the runway and became airborne. Immediately thereafter, Belcher, who could see the yoke in Yates' hands but could not see Hayes, saw a sharp jerky movement of the yoke to the right. This movement apparently was an intervention by Hayes. During the flight test, the safety pilot is not to hold the yoke, but is to stand by prepared to intervene in case of impending danger. After this attempt at a V1 cut, Yates managed to land the plane safely.
 
 
 9
 Belcher allegedly determined that this first "V1 cut" constituted "gray area", i.e. it was performed neither satisfactorily nor unsatisfactorily. Consequently, he directed Yates to perform another V1 cut. Neither Hayes nor Yates objected to doing the maneuver again. While waiting for tower clearance, Belcher gave Yates some basic information on the use of rudders and aileron in a V1 cut, including their use in a crosswind.
 
 
 10
 On the second try, as soon as V1 was reached, Hayes reduced the left engine to idle power. The plane yawed to the left. When Vr (the rotation or lift off speed) was achieved, Hayes called "rotate". When the airplane became airborne, it continued to yaw rapidly to the left until the edge of the left wing-tip fuel tank scraped ground twice. The plane crashed as it turned on its left wing and the nose hit the ground. Yates was killed in the wreck, which demolished the airplane. Belcher was seriously injured. Hayes was thrown clear but suffered severe and permanent brain/head injuries.
 
 
 11
 Jet East, Inc., Hayes, and his wife Jennifer Hayes, all claim in their suit against the United States that the FAA inspector Belcher negligently failed to give a pre-flight briefing, negligently gave an impermissible "second chance" at the V1 cut after Yates had already failed on the first try, and negligently gave flight instruction to applicant Yates.
 
 
 12
 Intervenors Granite State Insurance Company and National Union Fire Insurance Company sought to recover over $1,000,000 in worker's compensation paid to Hayes and the death benefits paid to the survivors of Yates.[3]
 
 
 13
 The district court conducted a bench trial in November 1988. The court held that Yates, Hayes, and Belcher each were negligent. Between Belcher and Hayes, Belcher the agent of the FAA was held to be 55% negligent in causing the crash, while Hayes was 45% negligent. The court therefore entered judgment against the United States and awarded Hayes over $2.5 million, which amount was 55% of his total damages. Jennifer Hayes was awarded $75,000 for her losses. Since the negligence of Hayes was imputed to his employer Jet East, the court awarded Jet East only 55% ($660,000) of its total property loss.
 
 
 14
 The United States appeals from the judgment. Jet East appeals from the district court's finding that Hayes was negligent.
 
 
 15
 II. FAA Inspector Belcher's Duty to Plaintiff-Appellees
 
 
 16
 The district court held that FAA Inspector Belcher owed plaintiff-appellees a duty to declare the first attempt at the V1 cut a failure, and not to allow Yates a second chance at the failed maneuver. He also was found to have violated an FAA rule against giving flight instruction. These duties arose from his unique position as inspector conducting the flight. The district court recognized this position as one "similar to a football coach, with authority to call the plays." Appellant United States urges that the district court erred because Belcher was an FAA inspector merely "observing the applicant's ability to perform satisfactorily the procedures and maneuvers on the flight test." 14 C.F.R. Sec. 61.47. In this official stance, he owed no duty to plaintiff/appellees to protect their safety or property during the flight test.
 
 
 17
 Under Texas law, the ordinary rules of negligence apply to aircraft accidents. Brooks v. United States, 695 F.2d 984, 987 (5th Cir.1983).[4] To prevail upon a claim of negligence, plaintiffs must prove the essential elements of negligence: a duty of reasonable care, breach of that duty, and damages resulting from the breach. Id. The existence and extent of a duty of care are questions of law. See Shankle v. United States, 796 F.2d 742, 745 (5th Cir.1986); City of New Orleans, Etc. v. American Commercial, Etc., 662 F.2d 1121, 1123 (5th Cir.1981); cf. Miller v. United States, 587 F.2d 991 (9th Cir.1978). We therefore review de novo the legal issue of whether Belcher had a duty to plaintiff-appellees.
 
 
 18
 Texas law recognizes two distinct sources of a legal duty. One is a duty arising from statute. The "unexcused violation of a statute setting an applicable standard of care constitutes negligence as a matter of law if the statute is designed to prevent an injury to that class of persons to which the injured party belongs." El Chico Corp. v. Poole, 732 S.W.2d 306, 312 (Tex.1987). The other source of legal duty is the general duty of due care recognized at common law.
 
 
 19
 The district court concluded that Belcher had a legal duty to the plaintiff-appellees to declare a test failure by Yates. Under the applicable FAA regulations, orders, procedures, and official policies, such a determination of failure would prohibit directing another test at that time.[5] But the government argues that even if the regulations were violated, and even if they set a standard of care, the regulations, orders, procedures, and policies were designed only for the purpose of determining an applicant's eligibility for the type rating sought. They were not designed to protect the safety of those participating in a flight examination. As such, they cannot give rise to a legal duty to comply with them. Rather, appellant asserts, the safety of the plane and its passengers was the sole province of safety pilot Hayes.
 
 
 20
 Contrary to the government's contention, there is testimony in the voluminous record before us that the applicable regulations were designed at least in part to protect the participants' safety during a flight test. We need not decide, however, whether the applicable FAA regulations and orders of their own accord give rise to a legal duty in tort. We hold that Texas law clearly imposes a duty on the inspector or designated examiner[6] in charge of a flight test to conduct a test with due care for the safety of those operating the aircraft under his direction.
 
 
 21
 Under Texas law, one has a duty to exercise reasonable care to avoid foreseeable injury to others. El Chico, supra, 732 S.W.2d at 311. Once Belcher affirmatively undertook to conduct the ill-fated flight test, he had a duty to order Yates to perform only those maneuvers that he reasonably believed she could execute safely. The district court found as a matter of fact that Yates failed to perform the first V1 cut in conformance with the requirements of the applicable FAA regulations, orders, procedures, and policies.[7] Since she failed the maneuver, FAA procedure required inspector Belcher to end that portion of the test at that point without ordering Yates to attempt the maneuver again. While we do not reach the question of whether Belcher's violations of the regulations, orders, procedures, and policies constitute negligence per se, they nonetheless supply the standard of competence required to execute a V1 cut safely. Because Yates failed the first cut, Belcher knew or should have known that Yates was incompetent to execute the maneuver. He should have foreseen the grave danger posed by requiring the incompetent Yates to attempt the maneuver again without further instruction and training. He therefore had a duty to refrain from ordering her to attempt a second V1 cut.
 
 
 22
 Appellant argues, to the contrary, that Belcher had no duty at all to act to protect the safety of the flight. He was merely a passive observer aboard the aircraft. Appellant contends, rather, that Hayes as safety pilot was solely responsible for safety.
 
 
 23
 This contention utterly fails to give adequate regard to the unique relationships among the participants in a flight test administered by an FAA inspector. According to record testimony, a flight usually has a single "pilot in command". The pilot in command, among other responsibilities, generally holds the ultimate responsibility to ensure safe operation of the aircraft. See 14 C.F.R. Sec. 91.3. During a flight test, the pilot applicant formally sits as pilot in command so that the inspector or examiner can determine if the applicant has the ability to perform the maneuvers and procedures required to be a certified pilot in command. Because the applicant's abilities are being tested during the flight and because they remain in doubt until he or she passes the examination, however, the inspector or examiner, who generally also acts as co-pilot, necessarily must perform certain duties of pilot in command. For example, the inspector decides what maneuvers or procedures the applicant must perform, and when, where, and in what manner he or she must execute them. These are matters usually reserved for the pilot in command to decide. See 14 C.F.R. Sec. 91. Additionally, in his or her capacity as co-pilot or safety pilot, the inspector has the responsibility to ensure safe operations. Testimony in the record is to the effect that when, as here, the inspector delegates the duties of co-pilot or safety pilot to a third person, a total of three people share the various duties of pilot in command.
 
 
 24
 We acknowledge that 14 C.F.R. Sec. 61.47 is susceptible in some measure to an interpretation that would contradict our conclusion. Section 61.47 states:
 
 
 25
 Sec. 61.47 Flight tests: Status of FAA inspectors and other authorized flight examiners.
 
 
 26
 An FAA inspector or other authorized flight examiner conducts the flight test of an applicant for a pilot certificate or rating for the purpose of observing the applicant's ability to perform satisfactorily the procedures and maneuvers on the flight test. The inspector or other examiner is not pilot in command of the aircraft during the flight test unless he acts in that capacity for the flight, or portion of the flight, by prior arrangement with the applicant or other person who would otherwise act as pilot in command of the flight, or portion of the flight.... (Emphasis added.)
 
 
 27
 On its face, the provision seems to support the government's contention that Belcher cannot be held liable for failing to direct the test in a safe manner. The argument would be that if the inspector is not the pilot in command during a flight test, and if the pilot in command is ultimately responsible for the safety of the plane, then the inspector cannot be responsible for failing to preserve safety.
 
 
 28
 Once again, this logic ignores the special situation of a flight test. This section merely restates and reinforces our conclusion that Yates, as pilot applicant seeking a type rating as pilot in command of a certain aircraft, was the pilot in command for purposes of the flight test. As pilot in command, she was ultimately responsible for the safety of the aircraft. But we are not concerned with her duties. Here we must determine the duties of the two other participants in the flight. Simply because Yates and not Belcher bore the title of pilot in command, it does not follow that Belcher also did not have any of the duties normally charged to a pilot in command. Since Yates had yet to show an ability to act as pilot in command successfully, the other participants necessarily took on some of her duties. Belcher made decisions as to what, where, when, and how they would fly. Hayes acted as co-pilot or safety pilot in order to back her up in case she erred. Each had a duty to fulfill his responsibilities with due care for the safety of the flight.
 
 
 29
 This peculiar circumstance of sharing duties inherently leaves the participants in a flight test in doubt as to the specific duties for which they are responsible, and as to where and when their duties arise. As the flight inspector conducting the test and overseeing the flight, Belcher decided which maneuvers would be performed, where and when they would be executed, and in what manner. Yates executed the test maneuvers at Belcher's affirmative direction while being tested pursuant to FAA requirements. Whatever the responsibilities of Yates and Hayes may have been, it was Belcher's responsibility as head or director of the flight test to make sure the participants knew the responsibilities of their respective roles. Belcher failed to brief the parties as to these critical details of the test. Further, he had the obvious obligation not to order a maneuver when prior performance indicated grave doubt as to the safety of the maneuver.
 
 
 30
 It is the particular scenario of this case that distinguishes it from the circumstances in Shankle v. United States, a Fifth Circuit case cited above. In Shankle, plaintiff was the widow of a passenger in a private plane killed in an airplane collision during a private formation flight. She sought to hold the government liable for negligently allowing the private pilots to make a "poorly planned" formation flight in the vicinity of an air base. The district court held that the air traffic controllers who were responsible for aircraft movement in the area were not negligent. But the plaintiff argued that because a military officer discussed the plan with the private pilots and helped them contact the proper persons to get permission for the flight, the government should have investigated the flight plan before allowing it to go forward. The district court agreed and held the government liable.
 
 
 31
 On appeal, this Court reversed and held that the government had no duty to control the actions of others unless they are under the "control" of the government. Since the pilots involved in the formation flight were not under the government's supervision or control "in any but the most indirect and attenuated sense," the government had no duty to stop the flight. Shankle, 796 F.2d at 746-47. In the present case, to the contrary, Belcher occupied a position with a significant control responsibility. All of Yates' actions were at the authoritative orders of Inspector Belcher who was directing all the elements of the test. He alone decided which maneuvers she was to execute and he alone was responsible for determining whether she passed or failed a given maneuver. Belcher also had authority and control over co-pilot Hayes, who acted as Belcher's "hands and feet," as testimony in the record stated it. Even though Hayes had the responsibility to take physical control of the plane in an ultimate emergency, Belcher nonetheless was the director of the flight and crew. He thus had a duty to direct with due regard for the safety of the flight. In its contention of "no duty", the government undertakes to create a legal technicality which is contrary to reality and common sense.
 
 III. Breach of Duty
 
 32
 Appellant argues that Belcher had no duty to stop the test and to refrain from requiring a second V1 cut because Yates in fact did not fail the first cut. It also argues that Belcher reasonably relied on the presence of safety pilot Hayes to intervene successfully if necessary to protect the safety of the flight. These arguments, however, really address the factual issue of whether he breached his duty to conduct the flight test in a reasonably safe manner.
 
 
 33
 The issue of breach of a duty is a question of fact. It is thus subject to the clearly erroneous standard of review. Fed.R.Civ.P. 52(a). The district court found that Belcher breached his duty to stop the test and not allow Yates a second chance at the maneuver when she failed the first maneuver.[8]
 
 
 34
 Under the clearly erroneous standard we evaluate appellant's assertion that Yates did not "fail" the first V1 cut, and that Belcher properly directed Yates to perform a second V1 cut. The record, however, amply supports the district court's finding that Yates failed to perform competently the first V1 cut in accordance with the requirements of the FAA. The district court's findings therefore are not clearly erroneous.
 
 
 35
 The government's second contention is that Belcher reasonably relied on Hayes as a back up in case Yates made any mistakes. Appellant's second argument fails to take into account, however, the nature of the maneuver at issue and the context in which the accident occurred. The V1 cut is an extremely dangerous maneuver. As testimony showed, it is one that rides the very "edge of the safety envelope". There was testimony that even the most competent safety pilot acting non-negligently may not be able to save the flight in the event an applicant errs. This circumstance exists particularly in the context of a flight test, as opposed to a training or instructional flight. During training, the instructor is free to intervene at any point and can give instruction to the student. The flight is completely under his or her control and command. During a flight test, however, the various participants share the duties of a pilot in command. In particular, the safety pilot's duties prohibit intervention unless the safety of the flight is in peril. The duty is not to interfere or intervene if it can possibly be avoided in the inspector's test of the applicant's ability to be a pilot in command. There was a great likelihood that Yates would fail the second attempt. Once Belcher knew that Yates was incompetent, he could not reasonably rely on Hayes to rescue them from her mistakes.
 
 
 36
 Appellant is correct that the first V1 cut factually was as dangerous as the second. Yates was no more or less competent the second time around. The crucial difference between the two cuts, however, is the knowledge of Yates' incompetence that Belcher possessed after her first attempt. His new knowledge rendered his order for her to try again starkly unreasonable.
 
 
 37
 Appellant additionally argues that if the danger posed by requiring Yates to try the maneuver again was so great, Hayes should have refused outright to do the second cut. Even if Hayes should have done so, it in no way excuses Belcher from his own responsibility as director of the flight to conduct the test in a safe manner. Belcher was equally capable of recognizing that Yates was incompetent to do the maneuver. It is a strange doctrine, indeed, that a hired safety pilot should have countered the order of the government inspector giving the test.
 
 
 38
 Further, it was a particular breach of duty that Belcher failed to give a pre-flight briefing to the participants in the flight test. Appellant contends that no pre-flight briefing was required due to Belcher's familiarity with Hayes' background and experience in giving internal Jet East checkrides and Belcher's knowledge of Yates in her work at Jet East. It is persuasive, however, that practice and common sense, as reflected in FAA policy,[9] dictated that a pre-flight briefing should have been given. The record shows that such a briefing should be given before every flight regardless of the abilities of the crew members and their previous experience flying together. An adequate briefing ensures that each member of the crew knows his or her respective duties and limitations during the particular flight involved. In this case, a pre-flight briefing would have informed Hayes and Yates of the rules and guidelines Belcher intended to employ to determine whether Yates passed or failed a particular maneuver. More important, Hayes would have known Belcher's expectations with respect to intervention and safety. Specifically, Belcher had the obligation in a briefing to make it clear that he was relying on Hayes to interfere with and override Belcher's decision to attempt the V1 cut again if Hayes thought safety requirements demanded it.
 
 
 39
 Furthermore, the record reveals that Belcher himself was casual about the risks involved in the V1 cut and generally preferred to let an applicant salvage his or her own mistakes before intervening. A witness who qualified as an expert on the psychological relationships between crew members testified that Belcher's behavior after the first test could not help but have communicated to Hayes that he felt that Hayes had intervened too quickly on the first V1 cut. If so, this indication would have confused Hayes, who then did not have a clear picture of Belcher's expectations regarding intervention. In short, a thorough pre-flight briefing would have alleviated much of the confusion and thus the risk. In this situation, Belcher could not reasonably rely on Hayes to pull them out of a rapidly deteriorating situation.
 
 
 40
 As head of the flight, Belcher had a duty to conduct the test with due care given to maintaining the safety of the flight. Taken together, Belcher's failure to give a preflight briefing and his order to Yates to try the already failed maneuver again in order to pass the V1 cut portion of the test, constitute a breach of his duty to conduct the test in a safe manner. The district court was not clearly erroneous in finding breach. The attempt by the government to claim that its inspector had no such duties is audacious to an extreme.
 
 IV. Proximate Cause
 
 41
 Appellant alternatively argues that, even if Belcher breached a duty owed to plaintiffs, the breach was not a proximate cause of the injuries suffered. Proximate cause, unlike duty, is a question of fact, and the district court's findings must be upheld unless clearly erroneous. Sebree v. United States, 567 F.2d 292, 294 (5th Cir.1978).
 
 
 42
 First, the government argues that there was no cause in fact. The assertion is abjectly meritless. If Belcher had not directed Yates to attempt the second V1 cut, the crash would not have occurred. The United States contends that Belcher's action to "allow" the second try was not an affirmative act causing the harm. Rather, Yates and Hayes exercised their own judgment in doing the maneuver and caused the crash. This line of reasoning completely ignores Belcher's significant role as director/leader of the flight. Belcher did not merely allow the second try, he affirmatively directed it.
 
 
 43
 Second, appellant argues Belcher's decision was not a legal cause of the injuries suffered because the result of his actions was not foreseeable. As we have already set out above, once Yates failed the first V1 cut, it was plainly foreseeable that a crash was a serious possibility if she tried again without further training and instruction. The extreme difficulty of the maneuver and the danger arising in its execution made it foreseeable that Hayes might not be able to salvage any mistake made by Yates. The district court did not err in concluding that Belcher's actions were a proximate cause of the accident.V. Hayes' Negligence
 
 
 44
 Cross-appellant Jet East contends that the district court erred in holding Hayes negligent in failing to intervene in time to save the plane from crashing. Jet East argues that Texas law recognizes a presumption that Hayes acted with due care, a presumption the government failed to overcome by a preponderance of the competent evidence. Alternatively, it argues that the factual finding of negligence was clearly erroneous based on the evidence taken as a whole.
 
 
 45
 Cross-appellant's first argument centers on the idea that because no one will voluntarily do an act that places his own life in danger, Texas law in those situations presumes that the person exercised due care for his or her safety. See Green v. Texas & Pac. Ry., 125 Tex. 168, 81 S.W.2d 669, 673 (1935). This presumption may serve to establish fully the fact of due care in the absence of direct evidence to the contrary. See H.E. Butt Grocery Co. v. Bruner, 530 S.W.2d 340, 344 (Tex.Civ.App.1975).
 
 
 46
 Jet East argues that the record contains no direct evidence that Hayes was negligent. Circumstantial evidence will not support a finding of negligence unless the circumstances relied upon have probative force sufficient to constitute the basis of a legal inference of negligence. See Green, supra, at 673. Neither the fact of an accident nor the fact of an opportunity to be negligent will support a legal inference of negligence. See General Motors Corp. v. Muncy, 367 F.2d 493, 498 (5th Cir.1966), cert. denied, 386 U.S. 1037, 87 S.Ct. 1476, 18 L.Ed.2d 600 (1967). Since the only evidence that Hayes was negligent is the fact that the plane crashed, Jet East urges that the government failed to prove by a preponderance of evidence that Hayes was negligent. Conjecture and speculation that Hayes executed specific acts of negligence cannot suffice. See Farriell v. Davis, 606 S.W.2d 344, 346 (Tex.Civ.App.1980). The facts found by the district court equally support an inference of no negligence as they do an inference of negligence. As such, the court could not infer negligence as a matter of Texas law. See e.g., $56,700 U.S. Currency v. State, 730 S.W.2d 659, 662 (Tex.1987); Litton Indus. Products v. Gammage, 668 S.W.2d 319, 324 (Tex.1984).
 
 
 47
 In other circumstances, the presumption might operate to bar recovery. In this case, however, the presumption is substantially weakened by the fact that Jack Hayes regularly placed himself in similar difficult situations which endangered his life. As check airman for Jet East, he frequently conducted checkrides for Jet East pilots, during which the pilots would execute V1 cuts. If even a non-negligent pilot at times cannot guarantee that he or she can salvage an error during a V1 cut, every time he embarks on a flight which will include the maneuver he enters a dangerous situation. We therefore cannot presume as a matter of law that Hayes acted with due care for his safety when he joined Yates during her examination flight.
 
 
 48
 Cross-appellants also claim that the district court erred in finding as a fact that Hayes was negligent. Based on the dearth of evidence in the record that Hayes could have rescued the plane after it started to go awry, they might be correct in their assertions but only if Hayes' duty arose only after it became clear that Yates was unable to control the maneuver. Hayes' responsibilities, however, extended beyond physical intervention. Hayes acted as "safety pilot" during the flight test. As his title connotes, he had an affirmative duty to protect the overall safety of the flight. If a particular maneuver could not be executed safely, he had a duty to ensure safety in whatever manner would be effective. Just as Belcher knew or should have known that a second attempt at the V1 cut posed a grave danger, Hayes likewise is charged with that knowledge. He had a duty to attempt to restrain Yates and Belcher from trying the V1 cut again. We duly recognize that Hayes' inferior position with respect to Belcher would have made restraint difficult. At a minimum, however, he should have informed his fellow crew members strenuously that, in his opinion, a second V1 cut would not be safe. Consequently, as safety pilot, Hayes breached his duty to intervene effectively to preserve the safety of the flight. The district court did not err.
 
 VI. Comparative Fault
 
 49
 The government contends that even if FAA Inspector Belcher was negligent the district court erred in finding that Belcher was 55% at fault and Hayes only 45% at fault. We review the district court's apportionment of fault under the clearly erroneous standard. See Allied Chemical Corp. v. Hess Tankship Co. of Del., 661 F.2d 1044, 1057 (5th Cir.1981); Murff v. United States, 785 F.2d 552 (5th Cir.1986).
 
 
 50
 The court based its findings of comparative fault on the following factors: (1) Belcher's negligence in directing the second cut was not committed under stress, while Hayes' failure to salvage the cut after Yates put the flight in imminent danger occurred under highly stressful conditions with no time to contemplate his actions; and (2) Belcher was the head "coach" in charge of overseeing the flight test operation.
 
 
 51
 While both Hayes and Belcher breached similar duties, it was Belcher who affirmatively directed Yates to try the V1 cut again. He was the leader and director of the flight. Hayes, on the other hand, merely participated in the flight test being conducted by Belcher. His failure to attempt to stop Belcher and Yates from re-trying the maneuver, though negligent, was caused in part by Belcher's failure to conduct a preflight briefing which should have included explicit instructions to Hayes to interfere with Belcher's decision if necessary to maintain safety. Summarizing these considerations, the district court reasonably found Belcher more negligent than Hayes. We do not find clear error in the district court's conclusion.
 
 VII. Damages
 
 52
 Appellant United States asserts that the amount of damages awarded to Jack Hayes for his future medical care expenses is excessive and without proper foundation.
 
 
 53
 An award of damages is a factual finding that may be upset only if clearly erroneous. F.R.C.P. Rule 52(a); Ingraham v. United States, 808 F.2d 1075 (5th Cir.1987). At trial, appellees offered the expert testimony of a number of witnesses. These witnesses included the physician rendering medical services at the facility (Lewis Bay) where Hayes is hospitalized, the "patients accounts representative" of that same facility, a speech pathologist who was Hayes' "program case manager" at the head injury center at the facility, and a professor of economics at Baylor. The court credited this testimony.
 
 
 54
 Appellant argues that these witnesses were not qualified to give testimony as to the cost of Hayes' future medical care. As appellees point out, however, competency of a witness is within the sound discretion of the trial court, and its determination will only be reviewed for abuse of discretion. See United States v. Saenz, 747 F.2d 930, 936 (5th Cir.1984); Dunn v. Sears, Roebuck & Co., 639 F.2d 1171, 1174 (5th Cir.1981). We find absolutely no evidence that the district court abused its discretion in judging as competent experts these witnesses who are intimately acquainted with Hayes' situation. The district court did not commit clear error in determining the proper award amount.
 
 VIII. Discretionary Function Exception
 
 55
 Finally, appellant United States claims that FAA examiner Belcher's decision directing Yates to make a second attempt at the V1 cut constitutes an exercise of the FAA's discretionary function, which would except the U.S. from liability under the FTCA. Section 2680(a) of the FTCA provides that the government cannot be held liable "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. Sec. 2680(a). The discretionary function exception is jurisdictional and cannot be waived. See United States v. Sherwood, 312 U.S. 584, 586-88, 61 S.Ct. 767, 769-71, 85 L.Ed. 1058 (1941); F.R.C.P. 12(h)(3).
 
 
 56
 To support its contention, the government asserts an analogy to a recent Supreme Court case, Berkovitz By Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), in which the Court considered whether the Food and Drug Administration and National Institute of Health's wrongful licensing of a manufacturer of a polio vaccine, and approving the release of a "lot" of that vaccine, fell within the discretionary function exception. The plaintiff alleged that the agencies had acted contrary to specific detailed duties mandated by federal law, and they therefore could not escape liability.
 
 
 57
 The Court held that the FTCA does not bar suits against the U.S. when federal agencies have failed to act in accordance with a specific mandatory directive. "It is the nature of the conduct, rather than the status of the actor, that governs" the applicability of the exception. Id. at 1958, citing United State v. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984). In determining whether the exception applies, the Court went on to say that it must first be determined whether the actions challenged allowed an element of judgment or choice. If so, then there must be a determination whether the judgment involved is of the kind that the discretionary function exception was designed to shield.
 
 
 58
 Appellant argues that Belcher's decision to permit further testing meets the two prongs of the above test. Even if Belcher's decisions contained an element of judgment within the meaning of the first prong, they do not fall within that class of discretionary acts Congress intended to protect. Belcher's actions were merely part of his day-to-day "operational function" and not policy-related at all. See Denham v. United States, 834 F.2d 518, 520-21 (5th Cir.1987). The discretionary exception to liability under the FTCA therefore does not apply.
 
 IX. Conclusion
 
 59
 We hold that as FAA inspector in charge of the flight, Belcher had a duty to direct the flight examination with due regard for the safety of the aircraft and its passengers. He breached his duty when he failed to give a preflight briefing, failed to stop the test upon Yates' failure to perform the first V1 cut competently, and negligently directed her to attempt the maneuver again. His negligence proximately caused the injuries suffered by plaintiff/appellees. As safety pilot, Jack Hayes also had a duty to ensure the safety of the flight. This duty was breached when he failed to try to stop Yates and Belcher from proceeding with the second V1 cut. His failure was a proximate cause of his own and the other appellees' injuries. Finally, the district court did not err in apportioning fault between Belcher and Hayes. The judgment of the district court is
 
 
 60
 AFFIRMED.
 
 
 
 [1]
 See 14 C.F.R. 61 Appendix A
 
 
 [2]
 See The Southwest Supplement to F.A.A. Order 8710.4
 
 
 [3]
 On the first day of trial, however, the intervenors voluntarily dismissed all of their claims arising from the death of Yates. They also had filed a direct action for the wrongful death of Yates on behalf of her estate and survivors. Plaintiffs and intervenors also had sued Gates Learjet Corporation under a products liability theory, but those claims were dismissed before trial
 
 
 [4]
 In a claim of negligence brought pursuant to the FTCA, the state's substantive law of negligence controls. See, e.g., Brooks v. United States, supra, 695 F.2d at 987
 
 
 [5]
 The relevant regulations, orders, and policies are contained in: 14 C.F.R. Sec. 61.43; 14 C.F.R. 61 Appendix A, Federal Aviation Administration Order 8710.4, The Southwest Supplement to F.A.A. Order 8710.4, and Advisory Circular 61-77
 
 
 [6]
 An "inspector" is an employee of the FAA. An "examiner" is a private person authorized to give such flight tests
 
 
 [7]
 FAA Advisory Circular AC 61-77 is the practical test guide applicable to examinations for the Airline Transport Pilot Certificate, or a type rating on that certificate. AC 61-77 provides in relevant part:
 When the applicant's final performance of any required maneuver or procedure is unsatisfactory, the practical test is unsatisfactory.
 In addition to the specific factors considered for a particular maneuver or procedure, the examiner will evaluate the applicant's performance on the basis of the judgment, knowledge, accuracy, and smoothness he displays. Any procedure or action, or lack thereof, which requires the intervention of the examiner to maintain safe flight will be disqualifying. Failure of the applicant to take positive action to ensure that the flight area is clear of conflicting traffic will also be disqualifying. A competent performance, then, is one in which the applicant is obviously the master of the airplane and the successful and safe completion of the maneuver or procedure is never seriously in doubt.
 The maneuvers and procedures set forth in this guide must be performed in a manner that satisfactorily demonstrates the applicant's knowledge and skill with respect to--
 a. the airplane, its systems and components; and
 b. the proper control of airspeed, configuration, direction, altitude, and attitude in accordance with procedures and limitations contained in the manufacturer's published recommendations, and
 c. compliance with approved enroute, instrument approach, ATC, or other applicable procedures.
 FAA Regulation Sec. 61.43, 14 C.F.R. Sec. 61.43, although in terms applicable only to flight tests for commercial or private pilot certificates, outlines virtually identical requirements for passing a flight examination.
 The district court's determination, substantially supported in the record, that Yates failed the first V1 cut was based in part on the fact that Hayes intervened in the maneuver, which results in automatic failure under the FAA rules. The court also relied on the following evidence as stated in the court's findings:
 As to the first V1 cut attempt, Marcus Belcher told others: The performance of the V1 cut was substandard; Nancy Yates did not totally demonstrate mastery of the aircraft with the successful performance never seriously in doubt; of the couple of thousand V1 cuts, [sic] he had observed, he had only seen several that were worse; he felt Nancy Yates did not quite understand the maneuver or did not exhibit a good understanding; based on what he saw, he did not want to pass her on the maneuver; her performance was not desirable; wasn't an acceptable one; she overcontrolled the aircraft; that her weakness was a lack of comprehension of really what to do; she screwed it up; she displayed a lack of ability; and he could not tell if she had ever done one worth a darn.
 
 
 [8]
 The district court also found Belcher breached his duty to refrain from giving instruction to Yates during the test. The court concluded, however, that that breach of duty was not a proximate cause of the crash
 
 
 [9]
 See The Southwest Supplement to FAA Order 8710.4, supra, at 39-SW1