# United States Court of Appeals for the Fifth Circuit

No. 24-40576

United States Court of Appeals
Fifth Circuit

**FILED**

May 18, 2026

Lyle W. Cayce
Clerk

Brittany Morris,

*Plaintiff—Appellant*,

*versus*

United States of America,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 1:22-CV-227

Before Higginbotham, Jones, and Southwick, *Circuit Judges*.
Leslie H. Southwick, *Circuit Judge*:

Brittany Morris was violently attacked by her ex-boyfriend, Rondell Malveaux, while he was on supervised release as a result of a conviction in federal court. Just three days before the attack, Morris warned his probation officer of Malveaux's threats against her. The officer promised to take specific steps to protect her but then failed to do so. After the assault, Morris brought a claim under the Federal Tort Claims Act alleging negligence and negligent undertaking. The district court, relying on an exception under the Act for misrepresentations, held that the officer's promises were key to Morris's suit and dismissed for lack of jurisdiction. We hold that the

allegedly negligent failure to take minimal actions to protect Morris is a separate and available claim. We REVERSE and REMAND.

## FACTUAL AND PROCEDURAL BACKGROUND

Beginning in 2011, Malveaux served consecutive state and federal sentences for illegal possession of a firearm, possession of illegal drugs, and assault on a public servant. Malveaux completed his term in prison and was released to serve three years of federal supervision in 2016. Thereafter, Malveaux was supervised at all relevant times by federal probation officer Beverly Matt.

As a condition of his supervised release, Malveaux was required to live at a residential reentry facility through November 27, 2019. Instead, Malveaux left without permission around August 1, 2019. He called Morris, who lived in Beaumont, Texas, in order to have her pick him up. Morris refused and instead notified Probation Officer Matt, explaining that Malveaux was a threat to Morris and her children. Officer Matt determined that Malveaux was in violation of his supervised release and a danger, so she informed Morris that a warrant would issue for Malveaux's arrest.

Officer Matt petitioned for a warrant on August 2, citing: (1) failure to report to a halfway house; (2) failure to install a telephone line; (3) failure to secure employment; (4) failure to notify regarding termination of employment; (5) testing positive for Phencyclidine (PCP); (6) admitting to smoking synthetic marijuana; (7) violating open container laws; (8) failure to attend substance abuse treatment; and (9) being discharged unsuccessfully from the halfway house. The petition did not refer to the threat Malveaux posed to Morris or state the petition was urgent.

In the early morning of August 4, Malveaux burglarized Morris's home, confronted Morris about not picking him up from the facility, and attacked Morris's friend. Malveaux left before the police arrived. Malveaux

then began calling and messaging Morris, threatening to kill her. Because Malveaux stole Morris's iPhone, Morris was able to obtain his approximate location using its Find My iPhone application. Morris reported his location to the local police and also informed Officer Matt about the threats, the assault, the burglary, and Malveaux's PCP use. Officer Matt assured Morris that an arrest warrant would issue "immediately," she would "make sure Morris was not in danger," and she would "ensure that Morris was safe to stay in her home."

Over the next two days, Officer Matt did not inform the court or the United States Attorney's office of these threatening developments and thus failed to signify the urgency of an arrest. Officer Matt also did not communicate with or notify local law enforcement about Malveaux's erratic and violent conduct. After those two days, Malveaux broke into Morris's home. He repeatedly stabbed Morris, breaking the blade of the knife off in her body. In the attack, Malveaux severed Morris's spinal cord, leaving her a quadriplegic.

Morris filed claims pursuant to the Federal Tort Claims Act (FTCA) in the United States District Court for the Eastern District of Texas. 28 U.S.C. § 2674. In her second amended and operative complaint, Morris asserts negligence and negligent undertaking claims against the United States. The Government moved to dismiss the complaint, arguing the court lacks subject matter jurisdiction because the facts pled by Morris fell within the FTCA's misrepresentation and discretionary function exceptions. The district court agreed that the misrepresentation exception applied and granted the Government's motion to dismiss.[1] Morris timely appealed.

---

[1] After the district court concluded the misrepresentation exception applied, it did not consider the applicability of the discretionary function exception.

## DISCUSSION

"This court reviews the grant of a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction *de novo*." *Life Partners Inc. v. United States*, 650 F.3d 1026, 1029 (5th Cir. 2011). The burden of proof is on the party asserting jurisdiction, and we "take[] as true all of the allegations of the complaint and the facts set out by the plaintiff." *Id.* The dismissal will be affirmed only if "it appears certain" that the plaintiff "cannot prove any set of facts in support" of a claim entitling the plaintiff to relief. *Id.* (citation and quotation marks omitted).

Morris's claims were filed pursuant to the FTCA, which provides a limited waiver of sovereign immunity. 28 U.S.C. §§ 1346(b), 2671–2680. The FTCA grants jurisdiction to district courts for civil actions against the United States as to claims

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government . . . , under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

*Id.* § 1346(b)(1).

There are several exceptions to the FTCA's grant of jurisdiction, two of which the Government contends are applicable here. First, the FTCA exempts tort claims "arising out of . . . misrepresentation. *Id.* § 2680(h). Second, there is an exception for discretionary functions, which applies to actions "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of . . . an employee of the Government, whether or not the discretion involved be abused." *Id.* § 2680(a).

On appeal, Morris argues the district court erred in dismissing her claims, contending that neither exception applies in this case. We will separately analyze the two exceptions.

## I.   Misrepresentation Exception

### A.  Legal principles

The misrepresentation exception displaces federal courts' jurisdiction over "[a]ny claim arising out of" the common law tort of misrepresentation. *Id.* § 2680(h). The exception equally "applies to both negligent and intentional misrepresentations, as well as to both affirmative acts and omissions of material fact." *Metropolitan Life Ins. Co. v. Atkins*, 225 F.3d 510, 512 (5th Cir. 2000). Even a distinct cause of action is barred if the "underlying governmental conduct 'essential'" to the claim "can be fairly read to 'arise out of' conduct that would establish" a misrepresentation claim. *McNeily v. United States*, 6 F.3d 343, 347 (5th Cir. 1993) (citation omitted).

This circuit has adopted a two-step process to determine whether the misrepresentation exception bars a claim. *Life Partners*, 650 F.3d at 1031. At the first step, "we determine whether 'the chain of causation' from the alleged negligence to the injury depends upon a misrepresentation by a government agent." *Id.* (citation omitted). That entails "consider[ing] whether the focal point of the claim is negligence in the communication of (or failure to communicate) information or negligence in the performance of an operational task, with misrepresentation being merely collateral to such performance." *Metropolitan Life*, 225 F.3d at 512. For the exception to apply, the misrepresentation must be the "gravamen of the action." *Block v. Neal*, 460 U.S. 289, 296 (1983). If the chain of causation, in fact, depends upon a misrepresentation, then we move on to the second step and consider whether

sovereign immunity has been waived independently of the FTCA. *Life Partners*, 650 F.3d at 1032.

Morris contends that the misrepresentation exception is inapplicable here because the focal point of her claims is Officer Matt's failure to act with reasonable care, not misrepresentation.  Morris makes three supporting arguments.  First, Morris argues "the essence" of her negligent undertaking claim is "the inadequacy of Officer Matt's effort[s] to fulfill her promise to protect Morris, not the promise itself."  Second, Morris contends that Officer Matt's statements were not false because Officer Matt attempted to follow through on her promise but simply did so negligently.  Third, Morris asserts that the misrepresentation exception cannot apply because Officer Matt's negligent conduct was distinct from any failure of communication.

In response, the Government argues that Morris's claim began as one for misrepresentation but was then recast to circumvent the exception.  The Government also quotes the operative complaint, which contains allegations that "the least Matt could and should have done was to revise her instructions to Morris; instead of telling Morris not to worry, Matt should have told Morris to take precautions because Malveaux remained at large," and she should have "t[old] Morris that in fact Matt had not done enough to help keep Morris safe."  According to the Government, the district court properly looked beyond Morris's labeling of her claims to conclude that "the focus of Morris's charge was [Officer] Matt's failure to use due care in communicating information to Morris."

Our analysis starts with the reality that "the line between what constitutes a permissible negligence claim and a barred misrepresentation claim has not been clearly delineated." *Saraw P'ship v. United States*, 67 F.3d 567, 570 (5th Cir. 1995).  Since negligence and misrepresentation claims do

not divide cleanly, some overlap of the two will not doom an otherwise valid claim. *Block*, 460 U.S. at 298.

One example of this overlap was in *Block*, where a homeowner contracted for a prefabricated home approved by the Farmers Home Administration (FMHA). *Id.* at 291. An FMHA official inspected the home multiple times and approved the construction, issuing a report that the home matched specifications the agency had approved. *Id.* at 292. Once the homeowner moved in, she noticed her heat pump was not working and requested that the agency inspect the home again. *Id.* In this last inspection, FMHA uncovered thirteen additional defects. *Id.* The Supreme Court held that the FTCA's misrepresentation exception did not bar the homeowner's negligent undertaking claim. *Id.* at 294, 298–99. Even though the homeowner would have had a negligent misrepresentation claim if not for the misrepresentation exception, "the partial overlap between [the misrepresentation and negligent undertaking] actions does not support the conclusion that if one is excepted under the Tort Claims Act, the other must be as well." *Id.* at 298. Crucially, the Court held that FMHA's duty to exercise due care in supervising and inspecting construction was distinct from its duty to use due care in communication; therefore, there was jurisdiction over the negligent undertaking claim. *Id.* at 297. Indeed, though the Court specified that "the essence of an action for misrepresentation . . . is the communication of misinformation on which the recipient relies," it also recognized that negligent undertaking claims often include reliance as an element — the presence of reliance does not necessarily doom a negligent undertaking claim. *Id.* at 296–97 & n.5. The reliance essential to the homeowner's negligent undertaking claim, instead, gave rise to "'misrepresentation' only in the generic sense of the word," not sounding in the tort of negligent misrepresentation. *Id.* at 298 n.7.

In one of this court's precedents, we held that the essence of the conduct underlying the claim controls whether the claim, for FTCA purposes, "aris[es] out of . . . misrepresentation" or a different tort.[2] *Saraw*, 67 F.3d at 569–71 (quoting 28 U.S.C. § 2680(h)). In *Saraw*, a Veterans Affairs (VA) employee made a clerical error, causing the VA not to process Saraw's loan payment. *Id.* at 568. This error resulted in one of Saraw's loans falling into arrears and the VA foreclosing on one of Saraw's properties. *Id.* at 569. The misrepresentation exception question turned on whether the "*causa sine qua non*" of the alleged tort was either the "erroneous keypunch" leading to the clerical error or the VA's failure to communicate that it did not receive payment. *Id.* at 570–71. We held that the "essential act that spawned" the alleged tort was the VA's "mishandling of Saraw's payments," not its faulty communication. *Id.* In coming to this conclusion, we contrasted misrepresentation injuries — the "essence [of which] is the communication of misinformation *on which the recipient relies*" — with the injury caused by the alleged non-excepted tort, there the "government's careless handling of Saraw's loan payments." *Id.* (quoting *Block*, 460 U.S. at 296). Based on this analysis, we held that any failure to communicate, and the accompanying reliance harm, "seem[ed] collateral" to the case and that the "proper focal point . . . [was] the alleged negligently [] performed operational task of the government." *Id.*

Further, when the focal point of the claim is the "negligent performance of an operational task," the conduct is not, at its essence, a

---

[2] Judicial opinions have used different descriptors in explaining the inquiry, including "*causa sine qua non*" or "essence" of the claim, *Saraw*, 67 F.3d at 570–71, as well as the "focal point," *Metropolitan Life*, 225 F.3d at 512, or the "gravamen" of the tort, *Block*, 460 U.S. at 296. Regardless of the phrasing used to describe the concept, the meaning is the same: We reduce the claim, including the alleged conduct, to its basic nature and determine whether it arises out of the breach of a duty distinct from misrepresentation.

misrepresentation for FTCA purposes. *Metropolitan Life*, 225 F.3d at 513. In *Metropolitan Life*, the sister of a deceased individual brought a third-party negligence claim against the United States pursuant to the FTCA, asserting that she was unable to recover on her brother's life insurance policy, of which she was the named beneficiary, because a federal personnel clerk had failed to preserve a signed original copy of the deceased's beneficiary form. *Id.* at 512. We held the "focal point" of the alleged tort was not the failure to communicate that the clerk had misplaced the document, but rather the government's misplacing it at the outset. *Id.* at 512–13. We resisted relying on the fact that the harm likely would have been remedied by communication, as that was not the *essence* of the claim. *See id.* Those facts presented a particularly close question, but even there this court held there was no misrepresentation.

In contrast, we held in *Life Partners* that the misrepresentation exception applied when an agency falsely characterized the status of a life insurance policy to a buyer, causing the buyer to pay for a policy that had already been assigned to another party. *Life Partners*, 650 F.3d at 1028–29, 1034. Life Partners' claims depended entirely on facts that amounted to misrepresentations — telling Life Partners that the life insurance policy had not previously been assigned though it actually had been. *Id.* at 1033. Because "Life Partners would have suffered no injury absent the misrepresentation," the suit was barred by Section 2680(h). *Id.* at 1033–34.

There is one more significant Supreme Court precedent to discuss. *See United States v. Neustadt*, 366 U.S. 696 (1961). In *Neustadt*, the plaintiff had purchased a home based on a Federal Housing Administration inspector's appraisal that did not account for the house's structural flaws. *Id.* at 699–700. Not long after Neustadt moved in, cracks in the ceiling and walls appeared that were caused by structural defects that seriously diminished the value of the house. *Id.* at 700–01. Neustadt brought suit against the United

States, seeking the difference between the fair market value of the house and the amount paid. *Id.* at 701. As the Court in *Block* identified, Neustadt's claim fell into the misrepresentation exception because "Neustadt alleged no injury that he would have suffered independently of his reliance on the erroneous appraisal." *Block*, 460 U.S. at 296. The exception applied because, even though the inspection itself was negligently performed, the harm arose from the "duty to use due care in obtaining and communicating information," the heart of the "traditional legal definition of 'negligent misrepresentation.'" *Id.* at 296 (quoting *Neustadt*, 366 U.S. at 706–07).

### B. *Allegations in complaint*

We now review the allegations in the operative complaint to determine whether the essence of Morris's claim sounds in negligent undertaking or in misrepresentation. In order to categorize the allegations accurately, we explain the elements of negligent undertaking and contrast that tort with the meaning of "misrepresentation" under the FTCA.

Texas law applies here, as the FTCA requires federal courts to apply the substantive tort law "of the state where the alleged negligence occurred." *Le v. United States*, 138 F.4th 264, 272 (5th Cir. 2025). "Under Texas law, a defendant who undertakes to render services that it knows or should know are necessary for the protection of the other's person or things must generally exercise reasonable care in performing the undertaking." *In re First Rsrv. Mgmt., L.O.*, 671 S.W.3d 653, 660 (Tex. 2023) (citation and quotation marks omitted). "The critical inquiry concerning the duty element of a negligent-undertaking theory is whether a defendant acted in a way that requires the imposition of a duty where one otherwise would not exist." *Id.* (citation and quotation marks omitted). The tort has these requirements: "(1) the defendant undertook to perform services that it knew or should have known were necessary for the plaintiff's protection; (2) the defendant failed to

exercise reasonable care in performing those services; and either (a) the plaintiff relied upon the defendant's performance, or (b) the defendant's performance increased the plaintiff's risk of harm." *Nall v. Plunkett*, 404 S.W.3d 552, 555–56 (Tex. 2014).

In contrast, "the essence of an action for misrepresentation . . . is the communication of misinformation on which the recipient relies." *Block*, 460 U.S. at 296. The Court has held that a claim asserting a breach of the "'duty to use due care in obtaining and communicating information upon which [the plaintiff] may reasonably be expected to rely in the conduct of his economic affairs,' merely restated the traditional legal definition of 'negligent misrepresentation' as would have been understood by Congress when the [FTCA] was enacted." *Id.* (quoting *Neustadt*, 366 U.S. at 706–07).

In her second amended complaint, Morris alleges that Officer Matt "submitted a petition for the Court to issue a warrant requiring Malveaux to appear" after Malveaux's unsuccessful discharge on August 2 and before his criminal activity on August 4, "but [Matt] did not mention the threat to Morris['s life] or indicate that the request was urgent." Morris asserts that "[d]uring a phone conversation after the burglary, Matt told Morris that Matt would get a warrant immediately, make sure Morris was not in danger, and ensure that Morris was safe to stay in her home."

We set out here several detailed paragraphs from the complaint. It is obvious that there are claims both of misrepresentation and of negligent failures to act:

> Matt . . . promised Morris that [Matt] would [protect her], promised to obtain a warrant, sought that warrant, and promised to make sure Morris would be safe in her home.
>
> [T]he court and the United States Attorney were not timely informed of Malveaux's violence or threat of murder, and so

no warrant for Malveaux's arrest issued before Malveaux's second attack. . . .

Matt and other employees of the United States . . . delay[ed] in informing local authorities of the probation violations, and fail[ed] to inform Morris of the lack of a warrant, such that protective measures could be taken. . . .

Moreover, Morris detrimentally relied on Matt . . . to supervise Malveaux and protect her from Malveaux by promptly obtaining a warrant for his arrest and arresting him, or taking such other actions as might be necessary to ensure Morris was safe. . . .

Malveaux was not properly supervised and Morris remained vulnerable to Malveaux, whereas if a warrant had [been] timely obtained[,] . . . then Malveaux likely would have been intercepted or diverted before he assaulted Morris, as his location was readily accessible due to his possession of her stolen iPhone and he could have been found using other law enforcement methods due to his reckless crime spree. . . .

Matt's failure to diligently communicate with Morris despite her promise and advice to Morris that she did not need to worry about Malveaux and Morris did not need to do anything further proximately caused Morris' injuries.

That second-to-last quoted paragraph is a fair summary of the alleged facts underlying the claim that Matt's failure to act caused Morris's horrendous injuries. The question is whether the facts alleged in the complaint support the breach of a duty distinct from a duty to communicate information with due care. *Williamson v. Dep't of Agric.*, 815 F.2d 368, 377 (5th Cir. 1987) (citing *Block*, 460 U.S. at 297). Of course, "the manner in which a plaintiff chooses to plead her claim is not controlling" since we look to the nature of the claim and the facts alleged therein. *Metropolitan Life*, 225 F.3d at 512. We must determine whether the gravamen of the claim is the

"negligen[t] . . . performance of an operational task," *id.* at 512, or only the "communication of misinformation," *Block*, 460 U.S. at 296.

We review the factual allegations. Officer Matt promised to protect Morris and obtain a warrant quickly, but she then broke that promise by failing to inform the court that Malveaux was dangerous. She also did not expedite the warrant process, even after Malveaux burglarized Morris's home and attacked Morris's friend while on PCP. The complaint alleges that Officer Matt's statements led Morris to rely on Officer Matt's undertaking, but reliance does not necessarily transform a negligent undertaking claim into a misrepresentation claim. *See Block*, 460 U.S. at 298. The complaint does not allege Morris changed her conduct in reliance on what Officer Matt said or that injury was the result of the reliance. While reliance on a "communication of misinformation" is the "essence of an action for misrepresentation," a claim does not fall into the misrepresentation exception so long as it alleges a valid claim independent of such reliance — *i.e.*, it is not a dressed-up misrepresentation claim. *Id.* at 296–98. Further, a "negligence claim may" properly "include an element of reliance," as did the negligent undertaking claim in *Block*; it must simply avoid the type of reliance required by the tort of misrepresentation. *Id.* at 297 n.7 (explaining that reliance in this context will "constitute 'misrepresentation' only in the generic sense of the word").

*Block* controls here. The *Block* Court viewed the homeowner's claim as primarily a function of FmHA's negligence because her claims turned on FmHA neglecting a duty *outside of* collecting and transmitting information. It was obligated, through its undertaking, to perform an operational task, *i.e.*, supervising construction with due care. *Id.* at 297–98. This rendered the homeowner's negligent undertaking claim "distinct" from the breach of the duty "to use due care in communicating information." *Id.* In *Neustadt*, by

contrast, the alleged injury was solely the result of the plaintiff's "reliance on the erroneous appraisal." *Id.* at 296.

As in *Block*, Morris's claims depend on a duty that extended beyond gathering and transmitting information with due care. Morris pled sufficient facts to conclude that Officer Matt, having made her discretionary decisions on how to perform her duties, was obligated to supervise Malveaux with due care and to pursue a warrant expeditiously. Those facts are easily distinguishable from the collection and transmission of defective information that constituted the injury in *Neustadt*. The facts of this case are analogous to the FmHA's concurrent, yet distinct, duties to oversee and inspect construction and to transmit true information to the homeowner. *Id.* at 297– 98. As in *Block*, Officer Matt's *additional* failure to exercise due care in transmitting information to Morris does not avail the United States. *See Truman v. United States*, 26 F.3d 592, 595 (5th Cir. 1994). Indeed, Officer Matt's misrepresentation punctuates the injury; the injury does not spring from it. The district court, in dismissing this suit, invoked *Life Partners* for the proposition that Morris's allegations solely "concern negligent communication." We held in that case that the claim fell into the misrepresentation exception because the negligent recordkeeping claim was wholly eclipsed by misrepresentation: Life Partners "would have suffered no injury absent the misrepresentation" because the only error was in negligently or intentionally representing the insurance policy's status. *Life Partners*, 650 F.3d at 1033. Accordingly, the focal point of that claim was misrepresentation, not the negligent performance of an operational task.

A more apt precedent for the facts of this case is *Metropolitan Life*. There, a federal employee's failure to "preserve and properly file" the deceased's insurance paperwork caused a dispute over which party, the named beneficiary or the decedent's widow, was entitled to the policy. *Metropolitan Life*, 225 F.3d at 511–13. This court held that the "crux of [the]

claim" was better understood as negligent handling of the personnel file, not failure to communicate that the paperwork was incorrectly completed or lost, even though better communication would have prevented the injury from occurring. *Id.* at 512–13. Here, the cornerstone of Morris's claim is that Malveaux's vicious assault occurred because of Officer Matt's lack of haste; the fact that events may have turned out differently had Officer Matt communicated better does not alter the essence of Morris's claim. *See id.* Morris's claim is certainly not wholly eclipsed by misrepresentations like those in *Life Partners.* That is because Morris alleges facts outside the ambit of gathering and transmitting information, thus beyond the scope of a duty to use due care in communicating information.

Though distinct, there is clearly some overlap between the negligent undertaking claim (which relies on the satisfaction of a duty to act non-negligently that may include a communication of information) and a misrepresentation (communication of misinformation on which the plaintiff relied). The Supreme Court has acknowledged this frequent overlap — especially between negligent undertaking and misrepresentation, which often share reliance as an element — and yet blessed claims for which the gravamen is the "breach of a different duty." *Block*, 460 U.S. at 297–98. Here, the gravamen of one of Morris's claims is Officer Matt's alleged breach of her duty to discharge her obligation to secure a warrant and Malveaux's arrest with due care. Though Morris's operative complaint mentions her reliance on Officer Matt's failure to "diligently communicate with Morris," that allegation is "collateral" to *this* claim, merely playing a supportive role in showing that Officer Matt's negligent conduct caused her injury rather than consisting of the claim itself. *See Metropolitan Life*, 225 F.3d at 512–13 (holding that the operational task was essential even though government's notification of its negligence in performing the operational task could have cured the harm). Indeed, Morris's claim that Officer Matt failed to seek a

warrant with dispatch and to secure Malveaux's arrest despite her duty to do so is conceptually distinct from the breach of the duty to use due care in communication — Officer Matt, under the facts alleged, would have failed to discharge her duty to act swiftly to Morris, even if Officer Matt had never communicated to Morris that she should stay home. Because these duties do not depend on each other, the complaint's phrasing does not change the fact that Morris's claims stem from Officer Matt's breach of a duty distinct from misrepresentation.

Since the essence of the facts on which Morris bases her claim is not misrepresentation, the district court erred in holding that the misrepresentation exception applies.

## II.    *Discretionary Function Exception*

The other relevant FTCA exception concerns discretionary functions. The discretionary function exception insulates the United States from "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . , whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Though the FTCA generally represents "Congress' willingness to impose tort liability" on the federal government, the discretionary function exception manifests its concomitant objective of "protect[ing] certain governmental activities from exposure to suit by private individuals." *United States v. Varig Airlines*, 467 U.S. 797, 808 (1984). "The basis for the discretionary function exception was Congress' desire to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Gonzalez v. United States*, 851 F.3d 538, 543 (5th Cir. 2017) (quotation marks omitted) (quoting *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988)).

The discretionary function analysis is governed by a two-part test. First, the action must, of course, be committed to the discretion of a government actor, such that the act "involves an element of judgment or choice." *Berkovitz*, 486 U.S. at 536.  Second, the complained-of "conduct must be 'of the kind that the discretionary function exception was designed to shield.'" *Barron v. United States*, 31 F.4th 347, 349–50 (5th Cir. 2022) (quoting *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991)).  "The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy." *Berkovitz*, 486 U.S. at 537.  More precisely, the critical question in the second part of the test is whether the officer's decision was "susceptible to policy analysis." *Spotts v. United States*, 613 F.3d 559, 572 (2010).  Whether the officer actually or subjectively engaged in policy analysis is accordingly irrelevant. *Id.*

Also, we must remember that the "nature of the conduct, rather than the status of the actor, . . . governs whether the discretionary function exception applies in a given case." *Varig Airlines*, 467 U.S. at 813.  Although tasks that implement a policy decision may at times lack an element of policy judgment, tasks conducted at the "operational level" do not categorically fall outside of the discretionary function exception — we must look to whether the particular action was susceptible to policy judgment. *Gaubert*, 499 U.S. at 326; *see id.* at 335–36 (SCALIA, J., concurring in part).  This is no simple task:  Nearly every governmental decision requires the consideration of policy in some manner. *See id.* at 336–37 (SCALIA, J., concurring in part). Accordingly, the task we focus on — determining whether "the challenged acts . . . are of the nature and quality that Congress intended to shield from tort liability," *Varig Airlines*, 467 U.S. at 813 — requires a "case-by-case approach," *see Shanksy v. United States*, 164 F.3d 688, 693 (1st Cir. 1999).

As for actually applying the test, the resolution of its first step inflects the analysis of the second, in that a regulation conferring discretion on a

federal employee creates a "strong presumption" that carrying out the regulation's commands implicates the "same policies which led to the promulgation of the regulations" in the first place. *Gaubert*, 499 U.S. at 324. This presumption may nonetheless be overcome by "alleg[ing] facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Id.* at 324–25.

Here, we find it necessary to consider only the second step: Whether Officer Matt's actions are in the category that the discretionary function exception is designed to shield. Even if we assume that Officer Matt's actions were discretionary, *i.e.*, that the first step is satisfied, Morris has alleged sufficient facts to support a finding that the kind of conduct undertaken by Officer Matt was not grounded in the policy of the regulatory regime and thus not susceptible to policy analysis.

The United States contends that the array of policy considerations listed in the Eastern District of Texas Post-Conviction Supervision Policy and Procedure Manual (EDTX Manual) demonstrates that Officer Matt's conduct was susceptible to policy considerations.[3] The United States cites several policy considerations listed in the EDTX Manual, which requires officers to consider, in deciding what strategy to take in response to violations of conditions of probation, the following factors among others: that interventions be "sufficient, but not greater than necessary, to achieve sentencing purposes and the objectives of supervision"; that a parole officer's conduct must be tailored to the "defined objectives of supervision, as determined by the initial and ongoing assessments"; and that officers must be "guided by the need to protect the community, promote compliance with

---

[3] The parties agree that this is the relevant "regulatory framework."

court orders, and facilitate positive change." The United States argues that, because probation officers must "balance the policies of achieving sentencing purposes with achieving the objectives of supervision" using the above factors, Officer Matt's actions were necessarily susceptible to policy analysis.

Morris counters that Officer Matt's response did not "involve considerations of public policy," even in theory. Morris contends that Officer Matt had already come to the "conclusion that [Malveaux was] a danger to the public, ha[d] made a homicidal threat, and ha[d] engaged in second-degree felonies"; in addition, Officer Matt had also decided on the "appropriate response." Morris asserts that, because the tort was committed in the performance of an "operational function," and the planning activity that involved policy considerations had already occurred, her claims are not barred by the FTCA.[4]

The caselaw provides considerable guidance for resolving this dispute. This court determined that the decision to provide certain "Emergency Housing Units" to victims of Hurricanes Katrina and Rita was a policy judgment. *In re FEMA Trailer Formaldehyde Prods. Liab. Litig. (La. Plaintiffs)*, 713 F.3d 807, 811 (5th Cir. 2013). Decisions about "when, where, and how to allocate limited resources within the exigencies of an emergency" are necessarily saturated with policy considerations and thus precisely the type of decisions the discretionary function exception is designed to insulate. *Id.* (quoting *Freeman v. United States*, 556 F.3d 326, 340 (5th Cir. 2009)). What compelled the outcome was that the decision the plaintiffs alleged to

---

[4] In support of this argument, Morris cites several cases decided employing the now-defunct operational–planning conduct dichotomy. *See, e.g.*, *Hayes v. United States*, 899 F.2d 438, 450–51 (5th Cir. 1990). The Supreme Court has definitively denounced this dichotomy. *Gaubert*, 499 U.S. at 325–26. We accordingly reject this aspect of Morris's argument below.

be the cause of their injuries was *itself* imbued with and inseparable from policy considerations. *See id.* at 810–11.

In a different yet related context, this court held that FEMA's decision not to attach stairs to emergency mobile trailer homes it offered for sale was precisely the kind of policy decision for which Congress sought to allow suits in tort. *Gibson v. United States*, 809 F.3d 807, 816–17 (5th Cir. 2016). In *Gibson*, this court described the decision of whether to include stairs as a "mundane, administrative, garden-variety, housekeeping problem." *Id.* (quoting *Gotha v. United States*, 115 F.3d 176, 181 (3d Cir. 1997)). Fundamentally, the types of policy considerations inherent to running a commercial business are distinct from those that the FTCA shields from judicial scrutiny. *Id.* at 816. On the other hand, had Gibson alleged the tort was the result of the decision even to operate as a business, the conduct would have fallen into the discretionary function exception. *See id.* The proximity between the decision to outfit the trailer homes with stairs and the decision to sell the mobile homes in the first place, however, was insufficient to clothe the claim in the discretionary function exception. The "mere association of a decision with regulatory concerns is not enough; exempt decisions are those fraught with . . . public policy considerations." *Id.* (quoting *Cope v. Scott*, 45 F.3d 445, 449 (D.C. Cir. 1995)). For example, "negligent driving by a government official does not implicate the kinds of policy considerations protected by the exception," even if the reason for the travel is to make a policy decision at the destination, since the official did not exercise the sorts of policy judgment shielded by the exception in performing the action from which the tort arose. *See id.* at 814.

In another one of our cases, we held that the United States Forest Service's actions were susceptible to policy considerations in determining how to provide sufficient notice of a trail closure. *Gonzalez*, 851 F.3d at 542, 551. The trail had been closed for maintenance arising out of the erection of

an unauthorized bridge near the trail. *Id.* at 541. The Forest Service had posted a sign on the trailhead bulletin board announcing the trail's closure on an 8.5" by 11" sheet of paper. *Id.* at 542. Gonzalez, the plaintiff, proceeded to ride a mountain bike on the trail and was injured after using an unauthorized bike ramp that was neither constructed by nor known to Forest Service employees. *Id.* at 541. We held that the Forest Service's actions were animated by, and certainly susceptible to, policy considerations, including the decisions (1) to allocate maintenance resources in a particular manner, given the vast quantities of land subject to Forest Service jurisdiction, and (2) how best to warn the public of a trail closure. *Id.* at 547–550. Crucially, the tortious conduct was the locus of the Forest Service's balancing of competing policy considerations. *Id.* at 548.

Decisions made prior to the tortious conduct that are not the actual tortious conduct may nonetheless influence whether a particular decision is susceptible to policy judgment. The D.C. Circuit held that the failure to post adequate traffic signs on Beach Drive in Washington, D.C., was not susceptible to the kind of policy considerations with which the FTCA is concerned. *Cope*, 45 F.3d at 452. Though the court held that the plaintiff's first claim — failure to maintain the road surface properly — fell within the discretionary function exception, it held that the second claim, which asserted that the government's decisions about "where and how" it posted signs "warning of dangerous road conditions," survived the discretionary function exception. *Id.* at 446. The court held that the sign-placement decisions were subject to discretion, but it was not discretion "fraught with public policy considerations." *Id.* at 451. There, the agency had elected, by placing an abundance of other warning signs along the road, to maintain the road "in a manner more amenable to commuting through nature than communing with it. Having done so, and having taken steps to warn users of dangers inherent in that use, the Park Service [could not] argue that its failure

to ensure that those steps [we]re effective involve[d] protected 'discretionary' decisions." *Id.* at 452. The court did not come to this conclusion because it drew a distinction between policy design and policy implementation, but because the Park Service's prior policy decisions deprived this particular decision of its policy content. *See id.* at 449, 451–52. Since the policy decision did not coincide with the tortious conduct, prong two was not satisfied. *See id.* at 452.

The Supreme Court has also mandated that courts scrutinize whether the conduct susceptible to policy decisions shares the same vehicle as the tortious conduct. In its leading step two case, *Gaubert*, the Court distinguished between scenarios where the government actor retained "discretion to exercise in deciding how to carry out" a task and those in which the implementation of a previously made policy decision required no further policy choices. *Gaubert*, 499 U.S. at 325–26. The Supreme Court illustrated this understanding in *Berkovitz* when discussing the facts of *Indian Towing Co. v. United States*, 350 U.S. 61 (1955). The Court contrasted the "decision to undertake and maintain [a] lighthouse," which was steeped in policy, with the "failure to maintain the lighthouse in good condition," which involved no policy judgment under the FTCA at all. *Berkovitz*, 486 U.S. at 538 n.3.[5] We agree with a leading treatise that "the execution and implementation of policy or planning decisions normally are not covered by the exception (unless the implementing federal officials are themselves

---

[5] *Indian Towing* is on uncertain footing in the realm of the discretionary function exception due to the fact it was not even a discretionary function exception case. *See, e.g.*, *Baum v. United States*, 986 F.2d 716, 723 (4th Cir. 1993). The Supreme Court has nonetheless found *Indian Towing* to be a helpful illustration of whether an act is susceptible to policy analysis. *Berkovitz*, 486 U.S. at 538 n.3; *Gaubert*, 499 U.S. at 326. Thus, we treat the Supreme Court's use of *Indian Towing* as such, but no more.

vested with discretion)." 2 Jayson & Longstreth, Handling Federal Tort Claims § 12.05[1] (2025).

In the past, we adhered to a rigid distinction between operational conduct and planning conduct, in which the discretionary function exception categorically did not apply to the former. *See, e.g.*, *Denham v. United States*, 834 F.2d 518, 520–21 (5th Cir. 1987). The Supreme Court abolished this dichotomy in *Gaubert*. 499 U.S. at 325–26. Nevertheless, *Gaubert* does not require us to discard all evidence of conduct's susceptibility to policy analysis when that evidence shows that an earlier policy decision deprives a later-in-time decision of policy content. *See id.* Indeed, it was the wooden quality of the dichotomy that led to its demise, not its complete lack of probative value. *See id.*; *id.* at 335–36 (Scalia, J., concurring in part) (explaining that the "dichotomy" is invalid, but "there is something to" the often close relationship between the level at which the decision was made and whether policy judgment was exercised). The problem with the old "mechanistic application of these frameworks" is that they "encourage[d] courts to avoid the proper analysis" — whether the conduct at issue, based on its "nature and quality," was susceptible to policy judgment. *Cope*, 45 F.3d at 448–49 (quoting *Varig Airlines*, 467 U.S. at 813).

Indeed, the nature and quality of conduct can be influenced by previous actions and decisions, and to evaluate whether a claim falls under the discretionary function exception at times will require consideration of evidence that a previous policy decision deprived an implementation decision of its policy content. *Gaubert* dictates both that we refuse to place conduct in any "semantic pigeonhole" and that we determine "whether the decision is 'fraught with' economic, political, or social judgments." *See id.* at 449–50. These principles are not in tension. Rather, they direct us to embrace the use of probative evidence to determine whether the suit second-guesses the Government's policy decisions. *See Gaubert*, 499 U.S. at 325–26. In this

sense, *whether* to engage in the conduct may involve a policy judgment, but it is not *necessarily* true that *how* to carry out that decision does as well: it depends on the factual context. *See Fair v. United States*, 234 F.2d 288, 294 (5th Cir. 1956) (holding Air Force's decision to release airman with known "homicidal tendencies" without giving certain promised warnings to victim did not fall within the exception because the tortious action was the failure merely to carry out a decision without any further occasion for policy deliberation); *Payton v. United States*, 679 F.2d 475, 480–81 (5th Cir. Unit B 1982) (*en banc*) (holding that a claim against the Government for its failure to properly treat a dangerous and mentally ill inmate after undertaking such care did not fall into the exception, but a tort claim against the parole board for its release of the prisoner in the first place did fall into the exception).[6]

Our understanding of *Gaubert* accords with JUSTICE SCALIA's exposition of the majority as laid out in his concurrence, in which he noted the majority's rejection of a mechanistic approach but recognized that the position of the actor and the operational versus planning status of the decision may possess probative, though not conclusive, value. *Gaubert*, 499 U.S. at 336–37 (SCALIA, J., concurring in part).

We now turn to the case before us.

In determining whether Morris overcomes the presumption that Officer Matt's failure to seek a warrant immediately was susceptible to policy judgment, we must look to whether Morris alleged sufficient facts to support a finding that Officer Matt's failure to act after undertaking to secure a warrant with expedience is not "the kind of conduct that can be said to be

---

[6] *Empower Texans, Inc. v. Geren*, 977 F.3d 367, 372 n.2 (5th Cir. 2020) (explaining that Unit B opinions, issued in 1981 by panels of judges formed solely of those who would serve on the future Eleventh Circuit, are precedential in the Fifth Circuit).

24-40576

grounded in the policy of the regulatory regime." *Id.* at 325. First, then, we pinpoint the policies that inhabit the regulatory regime.

The Government argues that enforcement decisions regarding supervised release are imbued with public policy, in part, because the "standard for selecting appropriate strategies in response to noncompliance is that they be sufficient, but not greater than necessary, to achieve sentencing purposes and the objectives of supervision." The EDTX Manual also provides probation officers with an "intervention framework," which provides a taxonomy of the different degrees of parole violations and outputs the type of response that a violation of that degree may warrant, though it does preserve significant discretion. Importantly, this framework serves as a "non-exhaustive list" that "illustrates potentially appropriate responses, suggested time frames, and associated staffing, approval, and reporting processes." The manual stresses that the "collaborative professional decision-making process" it lays out requires navigating a tangle of policy factors to come to a satisfactory intervention in any individual scenario.

Probation officers may well have to make decisions implicating a sensitive balance of policy factors on a regular basis. *Cf., e.g.*, *Ochran*, 117 F.3d at 501–04. We agree with the United States that Officer Matt made a policy-laden — and, by all accounts, sensible — decision to seek a warrant immediately after hearing about Malveaux's troubling behavior. Indeed, the claim is that Officer Matt made the quite valid decision to seek an immediate, expedited warrant predicated on the extreme risk to Morris, but then negligently failed to do so. In essence, the tort is the allegedly negligent performance by Officer Matt after her discretionary decision to secure a warrant posthaste.

The standards the Government cites are inapplicable in this case. Officer Matt had already determined which actions should be taken that

would be "sufficient, but not greater than necessary, to achieve" the goals of punishment, and the details of the intervention were already "directed toward[]" and "guided by" the "defined objectives of supervision" and the "need to . . . protect the community." She also engaged in this very policy analysis when she decided on the timeline for these actions: immediately. This combination of policy considerations would perhaps have been sufficient if the alleged tort was, itself, the decision of which course of action to take in effecting supervisory goals or was conduct the performance of which was bound up in making a judgment call implicating these same policy factors.[7] Rather, Officer Matt decided to seek a warrant on an expedited basis — a routine process that would, at least, involve informing the court and other proper federal authorities of imminent danger that Malveaux posed to Morris. Yet Officer Matt did not act after having earlier alerted the district court of the far less urgent facts of Malveaux's violating the terms of his supervised release after leaving the residential reentry facility.

Though a probation officer's task is often steeped in policy when deciding what intervention to perform, the failure to take any action for several days when already having decided to pursue a warrant on an expedited basis because the probationer poses a significant safety threat to an innocent is not one such action. "[M]ere association of a decision with regulatory concerns is not enough; exempt decisions are those fraught with . . . public policy considerations." *Gibson*, 809 F.3d at 816 (quoting

---

[7] A prime example of the latter is the Supreme Court's *Varig Airlines* case. In that case, the Federal Aviation Administration, according to the plaintiffs, negligently inspected an airplane, a defect of which resulted in the asphyxiation deaths of 124 people on board. *Varig Airlines*, 467 U.S. at 800–01. The Court held that the "spot-check" inspection that the agency performed requires, in its implementation, "[c]onformity determination[s]" that necessarily involve a variety of judgment calls motivated by a host of policy factors. *Id.* at 816–20.

*Cope*, 45 F.3d at 449).  The proximity of Officer Matt's inaction to policy decisions does not avail the United States.

Since Morris has shown that the allegedly tortious conduct here was not coincident with the policy considerations the Government pinpoints, she has pled facts sufficient to support a finding that Officer Matt's alleged negligence is not grounded in the policy of the regulatory regime.  *See id.*; *Cope*, 45 F.3d at 451–52.

We emphasize that this is an unusual case in several respects. Probation officers face thorny situations in which the best solution is unclear. We do not today create liability every time a federal employee negligently implements a policy.  The discretionary function exception still shields the government from suit for decisions of a probation officer or other official to take or not to take a particular course of action, given that the official's conduct is susceptible to the "permissible exercise of policy judgment." *See Ochran*, 117 F.3d at 506 (citation omitted).  Rather, we hold that the allegations of Officer Matt's negligence and negligent undertaking — taking the facts in Morris's pleadings as true for purposes of the jurisdictional inquiry — involved conduct that, according to its "nature and quality," was not susceptible to policy analysis, in context of this case's larger factual tapestry. *See Varig Airlines*, 467 U.S. at 813.  Because Officer Matt's actions were not susceptible to policy analysis, the discretionary function exception does not apply here.

REVERSED and REMANDED.